## UNITED STATES v. MUNSON S. S. LINE.

District Court, D. Maryland. March 22, 1929.

A. W. Woodcock, U. S. Atty., of Baltimore, Md., Elmer B. Collins, Sp. Asst. to the Atty. Gen., and L. W. Scott, of Washington, D. C., for the United States.

W. Calvin Chesnut, of Baltimore, Md., Irving L. Evans, of New York City, and Frank Lyon, of Washington, D. C., for Munson S. S. Line.

WILLIAM C. COLEMAN, District Judge. ▮ The jurisdictional question here presented is whether this court, in advance of action by the Interstate Commerce Commission, may entertain this proceeding, which is to determine whether the Munson Steamship Line is taking part in transportation under a common arrangement with rail carriers for continuous carriage or shipment, so as to obligate it to file tariffs. I find that this court, in advance of any action by the Interstate Commerce Commission, has jurisdiction to entertain this proceeding under section 20, par. 9, of the act (49 USCA § 20, par. 9). This was decided in the case of United States v. Union Stock Yards, 226 U. S. 286, 33 S. Ct. 83, 57 L. Ed. 226. It is true that case was an appeal from the Commerce Court, but, the jurisdiction of the Commerce Court having been transferred to the District Courts, I cannot distinguish between the jurisdiction which was assumed there, and approved by the Supreme Court, and the jurisdiction which I am asked to assume in the present case. That decision involved a number of points, most of which it is not necessary to mention here. But suffice it to say, with respect to the point now in controversy, that the Commerce Court held that the junction company was a common carrier, subject to the Interstate Commerce Act (49 USCA § 1 et seq.), and obliged to file its tariffs as required by statute. That part of the opinion of the Commerce Court was affirmed by the Supreme Court, and the proceeding appears to be a proceeding similar to the one which is brought in the present case, so that authority binds this court in the present instance.

### Charge to the Jury.

Gentlemen of the jury, I feel obliged at the conclusion of the evidence in this case to instruct you that the government has offered no evidence legally sufficient to show that the respondent, the Munson Line, was engaged in transportation, partly by rail and partly by water, under a common arrangement for a continuous carriage or shipment, and that, therefore, your verdict must be for the respondent. In other words, I feel it my duty, on the evidence, to direct your verdict in favor of the respondent.

It is my duty, however, to explain my reasons for so doing. Congress has seen fit to circumscribe the jurisdiction of the Interstate Commerce Commission over water carriers. The act expressly applies to all common carriers engaged in interstate transportation of passengers or property as opposed to transportation wholly within one state, when such interstate transportation is "wholly by railroad, or partly by railroad and partly by

water when both are used under a common control, management, or arrangement for a continuous carriage or shipment." That is section 1, subsec. 1(a), of the act (49 USCA Sec. 1(1)(a). Another section of the act (section 15, par. 3, 49 USCA § 15, par. 3) authorizes the commission to establish through rates and maximum joint rates applicable to the transportation of property where one of the carriers is a water line, but the commission is expressly forbidden to establish any route classification or practice, or any rate, fare, or charge when the transportation is wholly by water; that is to say, there is no jurisdiction over port to port rates as such. In the very nature of things water transportation is less standardized and uniform than is rail transportation. There has never been the inherent need or ability to apply the same general requirements. At least, those seem to have been some of the fundamental considerations that moved Congress to legislate as it did. But, whatever may have been the motive, that is what Congress did.

The principal objects of the Interstate Commerce Act are to secure just and reasonable charges for transportation, to prohibit unjust discrimination in the rendering of like service under similar circumstances and conditions, to prevent undue or unreasonable preferences to persons, corporations, or localities, to prohibit greater compensation for a shorter than for a longer distance over the same line, and to abolish combinations for the pooling of rates.

The sole question in the present case is whether the Munson Line is taking part in transportation with rail carriers under a common arrangement for a continuous carriage or shipment. If it is, it is subject to the Interstate Commerce Act, and among the requirements imposed upon all carriers subject to that act is that they shall file their tariffs with the commission, which the Munson Line has not done, and it is the refusal to do this which forms the basis of the government's complaint in the present case. There is no claim that the Munson Line is engaged in transportation under a common *control* or *management* with the rail carriers, but merely under a common *arrangement;* that is to say, as you have seen from the evidence, there is no claim that the Munson Line was other than an independent steamship line.

What do these words "common arrangement" mean? The simplest, most usual case of common arrangement arises when goods are shipped by two or more connecting carriers under a through bill of lading from a point in one state to a point in another under an agreed division of the freight rate. However, a common arrangement may be manifested otherwise than by a through billing, because, obviously, the mere form or method of billing cannot destroy the real character of the transaction, and thereby deprive the commission of the authority which Congress intended it should have. In other words, we must look through form to substance.

It is to be borne in mind that, if the government is to succeed in the present case, the evidence must disclose two things: (1) That the arrangement for the carriage or shipment is a common one; and (2) that that carriage or shipment is continuous. By "common" the court thinks must be meant an arrangement between the two kinds of carriers, namely, the rail carrier and the water carrier, not merely an arrangement between the shipper and one of the carriers; and, further, that this mutual arrangement must contemplate some participation by both carriers in a continuous carriage or shipment, which is the subject of the arrangement. This must be true from the very object of the Interstate Commerce Act itself which, summarizing what the court has already said about its objects, is to protect the public against unreasonable and discriminatory rates.

Congress, as we have just seen, has not seen fit to give to the commission jurisdiction over port to port rates as such, but has merely said, as the court construes the section of the act now under consideration, that, if the port to port rate is to be participated in by a rail carrier, or if the rail carrier and the water carrier are so interrelated by control or management that the rail carrier would directly or indirectly profit from such rate, then jurisdiction must attach, because, otherwise, it would vitiate the power of the commission adequately to regulate all of the charges of that very class of carriers which the act expressly places under the jurisdiction of the Interstate Commerce Commission.

So, turning to the word "continuous," its use must be predicated upon the assumption that both the rail and the water carrier participate in some way in the *entire* movement. It does not mean continuous in a *physical* sense. It is admitted that neither under a through billing, nor under the method here in question, is the participation physically continuous, due to the transshipment in both instances at Baltimore. Even though in both instances the shipment be construed as equally continuous, it is simply tantamount to saying that there is in each case one interstate

movement, but, as we have just seen, only a very limited class of interstate movements involving water carriage is under the act.

Now, what are the facts in the present case? The rail carrier to Baltimore issues its bill of lading to the shipper, showing the destination of the shipment to be Baltimore. In due course of transportation the merchandise is delivered to the Munson Line. The bill of lading is surrendered to the rail carrier. The freight of the rail carrier is paid by the Munson Line, which then issues its bill of lading to the shipper for carriage of the goods by water from Baltimore to the point of destination. The Munson Line is instructed by separate written advice from the shipper as to what disposition to make of the goods, and the Munson Line issues its own separate bill of lading accordingly. The freight rate for the transportation of the goods by rail to Baltimore is fixed and determined by the tariffs and the separate bill of lading issued by the rail carrier, and is paid by the Munson Line at the request of the shipper to the rail carrier, upon presentation of bills for the freight by the rail carrier.

There is no evidence in the present case of any agreement of any kind, verbal or written, existing between the shipper or the Munson Line, or both, with the rail carrier, except as is embraced in the rail carrier's bill of lading, to which, as I just explained, the respondent is not a party, and except as is also embraced in the related documents, such as the waybill and so forth; that is to say, there is no agreement in evidence in this case between the rail carrier and the water carrier with regard to either a through bill of lading or any agreement for division between them of a through rate. Neither has filed with the commission any tariff or schedule of charges for a through rate, partly by rail and partly by water. In all cases the destination under the rail billing is Baltimore. The consignee named is either the shipper at Baltimore or the Munson Line, as agents for the shipper, or the shipper in care of the Munson Line. The Munson Line looks to the shipper for instructions as to the further carriage of the merchandise, and in every case the Munson Line receives a separate written order from the shipper as to the further carriage. The Munson Line then makes out and sends to the shipper its own bill of lading for the ocean carriage, in which its freight rate is specified. If the railroad freight rate has not been paid by the shipper, it is advanced and paid—that is, if it is not a prepaid shipment—it is advanced and paid for his account by the Munson Line to the rail carrier on presentation of bill, irrespective of its collection by the Munson Line from the consignee at the point of destination at the end of the water carriage. In so far as the rail carrier is concerned, since it does not issue a through bill of lading, its contract of carriage terminates when the goods are delivered in Baltimore. Upon their arrival there, the railroad sends an arrival notice to the Munson Line, as in the case of any other shipment consigned to Baltimore, and, after the free time allowed by the tariff regulations, the railroad ceases to be liable as a carrier, and becomes liable merely as a bailee. If the billing is an order bill of lading, as distinguished from a straight bill of lading, it must be surrendered to the rail carrier before delivery of the goods is made.

In support of its claim that the respondent is a party to an arrangement common to it and the rail carrier, and that, therefore, the claim of the separate billing is a mere subterfuge to escape the jurisdiction of the commission, the government stresses the fact that there is noted in the descriptive portion of the billing, and on the annexed or accompanying papers, the ultimate destination of the shipment, but the court finds that there is no evidence tending to show that this does more than serve as a convenience in the subsequent movement of the freight; that is to say, there is no evidence of any greater joint arrangement between the rail and water carriers than has just been described.

In accepting shipment from the rail carrier and in advancing the freight charges at Baltimore, the steamship company acts as agent for the shipper. The relationship between the steamship company and the railroad is not different from that between rail carriers and consignors or consignees generally. There is nothing forbidden in this method of handling freight charges. The rail carrier's contract ends with the delivery on the pier, unless there be some terminal or lighterage service. The transfer of the goods from the pier to the vessel is performed by stevedores acting for the water carrier, and the charges for the same are absorbed by the water carrier. It will be admitted, of course, that this entire method of handling shipments tends toward more prompt and efficient transportation and delivery, and is of mutual advantage both to the shipper and to the carrier, but the court finds that this in itself is not sufficient to offset the legal independence which the court finds exists between the contract of carriage of the one carrier and that of the other.

The government also stresses the fact that,

under the plan adopted of settling the rail carrier's freight bill, the respondent, and therefore the shipper, is accorded a greater credit period than the ordinary consignee at Baltimore obtains under existing carrier's rules. But this also the court finds is merely incidental to *an* arrangement, and is not indicative of a *common* arrangement, such as the act contemplates. Whether more credit is actually now being extended by the railroad to the Munson Line than the law allows is a question which may require investigation in a proper proceeding, but it does not prove, the court thinks, or tend to prove, in the absence of more evidence on the point, such common arrangement between the two carriers, covering the situation here complained of, as that term must be understood to be used in the law.

It may be desirable to stop the existing practice here complained of, but this is a request that should be addressed to Congress, not to this court. What Congress may have intended to do, or should have done, is not the question, but rather—What has it, in fact, done? The court finds that it has not embraced in existing legislation the method now in controversy.

Gentlemen of the jury, for these reasons, I direct you to find a verdict for the respondent.

Verdict of the jury as directed by the court.