# UNITED STATES v. MUNSON STEAMSHIP LINE.

Circuit Court of Appeals, Fourth Circuit.
January 14, 1930.

No. 2908.

682

A. W. W. Woodcock, U. S. Atty., of Baltimore, Md., and Elmer B. Collins, Sp. Asst. to Atty. Gen. (John Lord O'Brian, Asst. to Atty. Gen., and Z. W. Scott, Atty., Interstate Commerce Commission, of Washington, D. C., on the brief), for the United States.

W. Calvin Chesnut, of Baltimore, Md., Frank Lyon, of Washington, D. C., and Irving L. Evans, of New York City, for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and McDOWELL, District Judge.

PARKER, Circuit Judge (after stating the facts as above).  Every common carrier subject to the provisions of the Interstate Commerce Act (49 USCA § 1 et seq.) is required, under penalty, to file with the Interstate Commerce Commission, and print and keep open for public inspection, schedules of its rates, fares, and charges, and conform thereto. 49 USCA § 6. The question in the case is whether the defendant, being admittedly a carrier by water, is subject to the provisions of the act. It is well settled, of course, that water transportation unconnected with transportation by rail is not subject to its provisions. Wilmington Transportation Co. v. Cal. R. R. Com., 236 U. S. 151, 153, 35 S. Ct. 276, 59 L. Ed. 508; Ex Parte Koehler (C. C.) 30 F. 867, 869; In the Matter of Jurisdiction over Water Carriers, 15 I. C. C. 205, 207; Corona Coal Co. v. Secretary of War, 69 I. C. C. 389. Water carriers are subject, not to the Interstate Commerce Commission, but to the United States Shipping Board, and are required to file schedules of maximum rates with that Board, which is given supervisory power over their rates and practices. 39 Stat. 735, 46 USCA § 817. It is true that, under the

Panama Canal Act of Aug. 24, 1912, 37 Stat. 560, 568, 49 USCA § 6 (13), the Commission is given jurisdiction to establish through routes and maximum joint rates over rail and water lines. U. S. v. N. Y. Cent. R. R., 272 U. S. 457, 47 S. Ct. 130, 71 L. Ed. 350; Chicago R. I. & P. Ry. v. U. S., 274 U. S. 29, 47 S. Ct. 486, 71 L. Ed. 911. But it has not here attempted to exercise the power conferred by that act, and we may accordingly dismiss it from consideration.

■ All of the foregoing is conceded by the government, but it contends that defendant's transportation from Baltimore to the Florida ports is part of a continuous carriage or shipment begun by rail, and that the rail and water transportation are thus used under a common arrangement within the meaning of section 1(a) of the Interstate Commerce Act, as amended, which provides that the act shall apply to common carriers engaged in "the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment." 49 USCA § 1(a). It is admitted that defendant is not under a common control or management with any railroad line, and so the question is further narrowed to whether it handles the traffic in question under a "common arrangement for a continuous carriage or shipment" within the meaning of the act. We agree with the court below that it does not.

The meaning of "common arrangement," as thus used, is to be sought, not in abstract definitions, but in the purpose for which it was incorporated in the Interstate Commerce Act. The purpose of Congress in enacting that statute was not to regulate carriers by water but carriers by rail; and water carriers were made subject to its provisions only in so far as was necessary to prevent evasion of the act on the part of rail carriers. As said by Chairman Knapp of the Interstate Commerce Commission (later a Judge of this court) in the case entitled In the Matter of Jurisdiction over Water Carriers, supra, 15 I. C. C. at page 207:

"Looking to the history of the enactment, and without attempting to quote the pertinent portions of the congressional debates and committee reports preceding the enactment of the law in 1887, there can be no doubt that the main purpose of the act was to regulate transportation by railroad; that the regulation of water lines was merely incidental and collateral, and was included in

order that the regulation of railroads might be effective and not virtually nullified by arrangements between railroads and water lines."

It is clear that, but for the control given over transportation partly by rail and partly by water, such provisions of the act as the long and short haul clause and those prohibiting preferences, rebates, and special rates, could have been evaded without difficulty by manipulation of the water rates in cases where both rail and water carriage were used and both carriers were under a common control or management. This danger was to be anticipated also where, although common control and management were absent, there was an arrangement between the carriers for transportation as a single joint enterprise, as in case of through billing or conventional division of rates; and it was evidently to cover cases of this sort that provision was made for jurisdiction in cases of "common arrangement for a continuous carriage or shipment," as well as in cases of common control or management. In other words, Congress was guarding against the possibility of evasion arising from the fact that water carriage was a part of the transportation furnished; and it was intended to subject the water carrier to the jurisdiction of the Commission where it was within the power of the rail carrier to evade the act by his control over water rates, whether by control or management of the water carrier or other arrangement.

It follows from this, we think, that the "common arrangement" contemplated by the act must be one between the carriers themselves, giving to one or the other, or both, such an interest in or control over the entire undertaking as to constitute the continuous transportation in some sense a common enterprise; for under no other sort of arrangement would there exist the possibility of manipulating water rates so as to evade the act designed for the regulation of rail carriers. Such an arrangement as one to deliver freight at the end of a rail line to a water carrier to whom it is consigned and who transports it under a separate contract with the shipper, is clearly not a common arrangement within the spirit of the provision which we are considering; for, while such an arrangement might result in continuous transportation, it would furnish to the rail carrier no opportunity to evade the act, against which the provision was directed.

We must bear in mind, also, in interpreting the provision, that "common arrangement" is a general term used in connection with the more specific terms, "common control" and "common management," and, under the ejusdem generis rule, it must be interpreted as an arrangement analogous to common control or management; i. e., an arrangement attended with similar advantages and opportunities to the rail carrier and similar dangers to the public, having in view the reason and purpose of the provision. An arrangement which is nothing more than a provision for the delivery of freight to the agent of the shipper at the end of rail transportation is manifestly not such an arrangement.

In one of the earliest cases arising under this provision, Ex Parte Koehler (C. C.) supra, 30 F. 867 at page 869, Judge Deady said:

"But the interstate commerce act does not include or apply to all the instrumentalities or agencies used or engaged in interstate commerce. It does not include any water-craft unless it is used in connection with a railway, 'under a common control, management, or arrangement, for a continuous carriage or shipment.' * * * The mere fact that a railway wholly within a state and a vessel running between said state and another meet at a point within the railway state, and thus form a continuous line of transportation between the two states, by the one taking up the goods delivered by the other at its terminus, and carrying them thence to their destination, does not bring the carriers who so use the railway and steamer within the act. So long as the railway and steamer are each operated under a separate and distinct control, making its own rates, and only liable for the carriage and safe delivery of the goods at the end of its own route, the act does not apply to the transaction. To make these carriers subject to the act, the railway and vessel must, as therein provided, be operated or used under a 'common control'—a control to which each is alike subject, and by which rates are prescribed and bills of lading given for the carriage of goods over both routes as one.

"On this apparently plain exposition of the act, the railway of the Oregon & California Company and the steamers of the Oregon Railway & Navigation Company are not 'used under a common control, management, or arrangement' in this respect, and therefore are not subject to the act, although engaged in interstate commerce. Each carrier makes its own rate, and undertakes for the carriage and delivery of goods not otherwise than over its own route. The fact that both are interested in maintaining the traffic be-

tween Oregon and California over this route and by this means, so as to secure it against the competition of the Oregon Pacific, is not material. Each is at liberty, as far as the other is concerned, to raise or further reduce its rates to-morrow if the exigencies of the traffic permit or require it. The present rate is not the result of any 'arrangement' between the two carriers 'for a continuous carriage or shipment' from Oregon to San Francisco, and vice versa, but only an independent, though concurrent, reduction of rates by each over its own route, for the purpose of retaining the traffic thereon against the competition of a rival route."

In Mutual Transit Co. v. U. S. (C. C. A. 2nd) 178 F. 664, 666, a prosecution for violation of the statute against rebating, it appeared that defendant there, as in this case, was a water carrier, and had been transporting freight delivered to it by a railway company. It had refunded to the shipper a part of the rate charged, and the only question was whether it was a carrier subject to the act. This turned on whether there was a common arrangement between the defendant and the rail carrier. In holding that there was not the court, speaking through Judge Noyes, said:

"The phrase 'common arrangement,' in view of its context, evidently means an agreement or understanding between connecting carriers with respect to the transportation of merchandise and the charges and division of the charges to be made therefor. A mere agreement by an independent water carrier to accept freight from a connecting railroad, and to transport it for its own particular rate, might be an 'arrangement' for continuous carriage, but would not be a 'common arrangement.'"

In C., N. O. & T. P. Ry. v. Int. Com. Com., 162 U. S. 184, 192 and 193, 16 S. Ct. 700, 703, 40 L. Ed. 935 (the Social Circle Case), the court said:

"But when the Georgia Railroad Company enters into the carriage of foreign freight, by agreeing to receive the goods by virtue of foreign through bills of lading, and to participate in through rates and charges, it thereby becomes part of a continuous line, not made by a consolidation with the foreign companies, but made by an arrangement for the continuous carriage or shipment from one state to another, and thus becomes amenable to the federal act, in respect to such interstate commerce. * * * All we wish to be understood to hold is, that when goods shipped under a through bill of lading, from a point in one state to a point in another, are received in transit by a state common carrier, under a conventional division of the charges, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment, within the meaning of the act to regulate commerce. When we speak of a through bill of lading, we are referring to the usual method in use by connecting companies, and must not be understood to imply that a common control, management, or arrangement might not be otherwise manifested."

It will be noted that, while the court does not hold that common control, management, or arrangement may not be manifested otherwise than by through billing, it clearly implies that, for any arrangement to come within the meaning of the act, it must result in the creation of a "continuous line"; i. e., a line over which goods are transported by virtue of agreement, express or implied, between the carriers themselves. And we think that no case can be found holding that a common arrangement existed within the meaning of the act where there was not such "continuous line," created either by through billing or conventional division of rates. See Interstate Com. Com. v. Goodrich Transit Co., 224 U. S. 194, 32 S. Ct. 436, 56 L. Ed. 729; L. & N. R. Co. v. Behlmer, 175 U. S. 648, 20 S. Ct. 209, 44 L. Ed. 309; Standard Oil Co. v. U. S. (C. C. A. 2nd) 179 F. 614; U. S. v. Wood (D. C.) 145 F. 405, 411; U. S. v. Seaboard Ry. Co. (C. C.) 82 F. 563; Levy v. Old Dominion S. S. Co., 91 Misc. Rep. 35, 154 N. Y. S. 227.

But under no possible definition of "common arrangement" could what is shown here bring the defendant within the meaning of the term. There was no "continuous line" for traffic created by virtue of the receipt of goods on through bills of lading or conventional division of charges, as in the Social Circle Case. There was, to apply the test laid down by Judge Noyes in the Mutual Transit Co. Case, no understanding between the carriers with respect to the "charges and division of charges" to be made for transportation. There was no through bill of lading, no through or joint rate, no agreement for the division of the aggregate of the separate rail and water rates, and no agreement between the carriers, either express or implied, that defendant should carry the freight delivered to it to any destination. In short, there was no common arrangement of any sort between the carriers giving them such an interest in or control over the ship-

ment, from point of origin to the ultimate destination in Florida, as to constitute the transportation in any sense a common enterprise. There was an arrangement by which freight shipped to Baltimore, but destined by the shipper for further shipment to Florida ports under a separate contract, should be delivered to defendant as agent of the shipper; but this is a very different thing from a common arrangement between the carriers themselves for continuous transportation.

It is argued that a common arrangement 'for continuous transportation is shown by the fact that the rail carrier allows the name and address of the ultimate consignee in Florida to be noted on its waybills and bills of lading, and that its freight charges are paid by defendant. But it is clear that the notation in question is made merely for the convenience of the carriers in handling the freight, and that no contract or obligation with respect to further carriage arises between them because of same. On the contrary, the freight is handled by each carrier under a separate contract with the shipper, and neither has any part in the charges or obligations of the other.

The same is true as to the payment of rail charges by defendant. These charges constitute liens on the freight involved; and for defendant to pay them when taking possession of the freight for handling under its contract can no more be said to be a common arrangement between the carriers for continuous transportation than the payment of such charges by a warehouseman would make the railroad and warehouseman parties to a common enterprise. Defendant pays the rail charges, or becomes absolutely liable for them, when the freight is delivered to it. It does not participate in the charges of the rail carrier, nor does the latter participate in its charges; but each performs the service it renders under its own charges without sharing in any way either the charges or the liability of the other.

In the case of Baltimore Association of Commerce et al. v. American Hawaiian Steamship Company et al. before the Interstate Commerce Commission, the very question was involved which is involved here. While the case was dismissed before being heard by the Commission, Examiner Hurley filed a report, finding that the Commission was without jurisdiction over the water carriers, and what he says as to notations on bills of lading and the payment of rail charges is of interest here. Said he:

"The indication of a Pacific Coast Port in 'the descriptive portion, or body, of the railroad bill of lading is but incidental and of no binding force or effect with respect to the contract of carriage. The evidence shows that the indication in the steamship bills of the railroad car from which the traffic is received is merely for convenience and identification purposes to enable shippers or carriers to check rates or to assist in placing responsibility for damage. In accepting the shipment from the rail carrier and in advancing the rail charges at the North Atlantic port the steamship company obviously is acting as agent for the Pacific Coast consignee. The relationship between the steamship company and the railroad can not be said to be different than that between the railroad carriers and agents of other consignees. The absorption of stevedoring and lightering charges by the rail carriers does not differentiate intercoastal traffic from traffic consumed at the port itself or from export traffic. As heretofore stated, the rail carrier's contract ends with delivery of the traffic on the pier. The transfer of the goods from the pier to the vessel is done by stevedores acting for the water carriers and the charges are absorbed by the water carrier.

"The method of handling the traffic under consideration, although indicative of an arrangement for its prompt and efficient interchange, is lacking in the essentials necessary to constitute a 'common arrangement' between the rail and the water carriers. On the contrary it clearly indicates their independence."

In the very recent case of Luckenbach Steamship Co., Inc., v. Southern Railway Co. et al., decided October 8, 1929, the Commission itself said that water carriers handling freight substantially in the manner in which it is handled by defendant here were not subject to the jurisdiction of the Commission. In that case the steamship company, which handled freight which had been or was to be transported by rail carriers for a part of its journey, petitioned that these carriers be required to file schedules of proportional rates lower than their regular local rates for rail carriage. In denying the petition, the Commission, speaking through Commissioner Brainerd, used the following pertinent language:

"The movement by water-and-rail in connection with complainant's steamships is not on through bills of lading. Complainant is not a party to joint rates with defendants. There is no arrangement for through and continuous transportation from origin to inland destination in connection with complainant's line and its rates and charges are

not subject to regulation by this Commission. * * * Complainant's charges on this traffic for its long haul vary from time to time. They have been as low as 30 cents in recent years. Its rates may be changed at any time at its discretion without being subject to suspension by this Commission. * * * Complainant, acting as a free lance in the transportation world, refuses to place itself in a position wherein its rates and charges might become subject to regulation by this Commission and yet seeks to invoke our aid in assisting it to divert from carriers subject to the act, and whose rates and charges are subject to regulation by us, certain traffic which the rail carriers now enjoy, on the plea that the situation, competitive or otherwise, does not justify the conduct of the rail carriers here complained of whose lines are used to complete the transportation of traffic brought into the ports by the complainant's boat lines and destined to points beyond via rail."

The government relies upon a line of cases, including B. & O. S. W. R. R. v. Settle, 260 U. S. 166, 43 S. Ct. 28, 67 L. Ed. 189; Baer Bros. v. Denver & R. G. R. R., 233 U. S. 479, 34 S. Ct. 641, 58 L. Ed. 1055; Texas & N. O. R. R. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442; and So. Pac. Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498, 31 S. Ct. 279, 55 L. Ed. 310, which hold that whether a shipment is interstate or intrastate depends upon the essential nature of the movement, and that neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk is an essential of a through interstate shipment. Those cases, however, have no application here. There is no question that the shipments here are moving in interstate commerce from the time they leave the point of origin until they reach their ultimate destination, but this would be true even though a part of the transportation were made without the aid of a common carrier. Champlain Realty Co. v. Town of Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195. The question here is not as to the ultimate destination of the shipment, as in those cases, but whether there was a common arrangement between the carriers by which they agreed to carry it to this ultimate destination. Unquestionably the freight in question is bound for an ultimate destination in Florida, but it reaches there, not by virtue of any common arrangement between the carriers, but by virtue of contracts made by the shipper with each car-

rier separately. This we think is decisive of the case.

In holding that the defendant was not shown to be subject to the requirements of the statute, we think that the decision of the learned judge below was correct; and same is accordingly affirmed.

Affirmed.