**UNITED STATES of America, Appellant,**

v.

**ST. REGIS PAPER CO., Appellee. No. 16, Docket 26413.**

United States Court of Appeals Second Circuit.

Argued Sept. 30, 1960.

Decided Dec. 16, 1960.

---

Richard H. Stern, Washington, D. C. (Robert A. Bicks, Asst. Atty. Gen., Richard A. Solomon, Washington, D. C., S. Hazard Gillespie, Jr., U. S. Atty., Southern Dist. of New York, New York City, Daniel J. McCauley, Jr., Gen. Counsel, Federal Trade Commission, Alan B. Hobbes, Asst. Gen. Counsel, Federal Trade Commission, J. B. Truly, Atty., Federal Trade Commission, Washington, D. C., on the brief), for appellant.

Horace R. Lamb, New York City (H. Richard Wachtel, Douglas W. Hawes, LeBoeuf, Lamb & Leiby, New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and TUTTLE * and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge.

These are appeals from a judgment of the United States District Court for the Southern District of New York, Ryan, J., in which the court partially enforced nine orders issued by the Federal Trade Commission against the St. Regis Paper Company and seven of its subsidiary corporations directing that special reports be filed and dismissed a claim for statutory penalties brought by the United States against St. Regis. By resolution of January 6, 1959, the Federal Trade Commission instituted an investigation into the acquisition by St. Regis of the stock and/or assets of other corporations engaged in interstate commerce in order to determine whether § 7 of the Clayton Act, 15 U.S.C.A. § 18, had been violated. On January 9, 1959, the Commission issued orders to St. Regis in New York City and five of its wholly-owned corporations located in various parts of the country.[1] These orders allowed the addressees thirty days to respond in writing in a "special report" to questions posed by the Commission and demands for copies of agreements, correspondence, office memoranda, annual reports, schedules, minutes of meetings, accountants' reports, and statistical summaries. St. Regis' motion to vacate the resolution and orders was denied by the Commission on May 6, 1959, and compliance ordered by May 28. On June 4, 1959, the Commission resolved to broaden its investigation to cover the acquisition of two other corporations[2] by St. Regis. Orders dated June 8, 1959 allowed St. Regis and the two subsidiaries thirty days to file special reports similar in content to those requested by the earlier directives.

Upon deciding that the material submitted to it did not meet its demands, the Commission filed notices of default against St. Regis and its subsidiaries on June 18 and July 22. The United States then brought suit in the Southern District of New York under § 9 of the Federal Trade Commission Act, 15 U.S.C.A. § 49, asking that a mandatory injunction issue commanding the corporations to file the special reports as requested and that the statutory penalties provided for by § 10 be assessed at the rate of $200 per day against St. Regis for its failure to respond to the two orders directed to it. The defendant's motion to strike the second demand on the ground that such relief would be unconstitutional was denied, D.C.S.D.N.Y.1959, 24 F.R.D. 366, and the case went to trial in the district court on both counts. Judge Ryan held that the Commission had the authority under § 6(b) of the Federal Trade Commission Act, 15 U.S.C.A. § 46(b), to order special reports in connection with pre-complaint investigations of possible violations of the Clayton Act, § 7; that some of the questions posed by the Commission were so vague and uncertain as to be unenforceable; and that the statutory forfeiture could not be invoked to penalize non-compliance with orders which are partially defective. D.C.S.D. N.Y.1960, 181 F.Supp. 862. The judgment below therefore modified the terms of the original orders insofar as it directed the defendant and its subsidiaries to reply only to those questions held enforceable and dismissed the second count of the government's complaint. The United States appeals from the dismissal, and St. Regis cross-appeals from the part of the judgment granting injunctive relief.

### I.

■■ Were we to accept literally the language of § 2 of the Expediting Act,

---

* Sitting by designation.

1. Growers Container Corp. (Salinas, Calif.), F. J. Kress Box Co. (Pittsburgh, Penna.), Pacific Waxed Paper Co. (Seattle, Wash.), Pollock Paper Corp. (Dallas, Texas), Rhinelander Paper Co. (Rhinelander, Wis.).

2. Cupples-Hesse Corp. (St. Louis, Mo.), Northwest Door Co. (Tacoma, Wash.).

49 U.S.C.A. § 45,[3] we would be required to dismiss these appeals although both parties urge us to hear them. That statute, as amended, provides in terms that in "every civil action" which the United States brings as a plaintiff in the district courts under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., or "any other Acts having a like purpose" thereafter enacted, appeals from final judgments are to "lie only to the Supreme Court." Both of the instant appeals are from a judgment entered in a civil suit instituted by the United States against various corporations under a statute which contains provisions similar in purpose to those of the Sherman Act.[4] However, we have construed the language of the statute, which as a result of an amendment of 1948 (62 Stat. 989) relates to "every civil action" instead of to "every suit in equity," as including only suits akin to actions in equity. United States v. New York, N. H. & H. R. R., 2 Cir., 1959, 276 F.2d 525, 543. The statutory penalty sought by the United States in its appeal is, indeed, not at all similar to equitable relief. However, this fact alone is not decisive of the question before us. Since the heart of the issue being litigated is the scope of

authority delegated to the Commission by Congress, the request for a forfeiture is but auxiliary to the demand for compliance. Thus, even if we were inclined to allow an appeal from one part of a judgment if an appeal from another part of the same judgment would properly lie only to the Supreme Court, we would not consider alone the appeal of the United States in this case. The unseverability of the issues to be decided requires that they all be determined in one action by the tribunal which is to pass on the basic question presented.

Nonetheless, we feel that a reasonable construction of the Expediting Act grants this court jurisdiction over appeals such as the one now before us. The writ of mandamus authorized by § 9 is, it is true, very much like a mandatory injunction, cf. Miguel v. McCarl, 1934, 291 U.S. 442, 452, 54 S.Ct. 465, 78 L.Ed. 901, particularly since it is addressed not to some public official or body but to a private corporation.[5] But it would be unreasonable to hold that the type of relief sought here by the Commission or the kind of determination which is to be made on such petitions for mandamus were deemed important enough by Congress to require a clear path from the

3. The relevant provisions of the statute as amended to date (56 Stat. 199, 62 Stat. 989) are as follows:

"That in any civil action brought in any district court of the United States under the Act entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies', approved July 2, 1890, 'An Act to regulate commerce', approved February 4, 1887, or any other Acts having a like purpose that hereafter may be enacted, wherein the United States is plaintiff, the Attorney General may file with the clerk of such court a certificate that, in his opinion, the case is of general public importance * * *."

"Sec. 2. In every civil action brought in any district court of the United States under any of said Acts, wherein the United States is complainant, an appeal from the final judgment of the district court will lie only to the Supreme Court."

4. Not only is any violation of the Sherman and Clayton Acts also a violation of

§ 5 of the Federal Trade Commission Act, Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 609, 73 S.Ct. 872, 97 L.Ed. 1277, but the Federal Trade Commission is expressly authorized by § 6 of the Act to investigate antitrust violations and by § 7 to act as a "master in chancery" to report on the proper form of an antitrust decree. Moreover, § 11 of the Clayton Act, 15 U.S.C.A. § 21, authorizes the Commission to enforce compliance with § 7 of the Clayton Act.

5. In United States v. Morton Salt Co., D.C.N.D.Ill.1948, 80 F.Supp. 419, affirmed 7 Cir., 1949, 174 F.2d 703, reversed 1950, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401, discussed *infra*, the request sought by the Attorney General under § 9 was framed not as a petition for mandamus but as a request for a mandatory injunction. See 80 F.Supp. at page 425. The request in this case was similarly phrased.

district court to the Supreme Court of the United States.

Under 15 U.S.C.A. § 45 as it stood before being amended in 1938, 52 Stat. 111, the Federal Trade Commission, to make its order final, was required to bring enforcement proceedings in the Court of Appeals upon learning that the order had been violated, and until 1959 all cease-and-desist orders issued by administrative agencies pursuant to § 11 of the Clayton Act, 15 U.S.C.A. § 21, had to be enforced in the same way. See 73 Stat. 243 (1959). Appeals from cease-and-desist orders of the Commission under 15 U.S.C.A. §§ 21(g), 45(g) are still taken to the Court of Appeals. Thus, were we to hold that the mandamus provision of § 9 brings actions for the enforcement of preliminary requests for information within § 2 of the Expediting Act, we would be conceding greater significance to the early investigatory stages of a Clayton Act proceeding than to the final determination of the enforcing agency. Furthermore, it is only because the Federal Trade Commission Act delegates to the Attorney General, rather than to the Commission, the authority to seek mandamus for compliance with the Commission's orders that the conditions of the Expediting Act, which requires that the United States be plaintiff, is met in this case. The analogue to this provision appeared, as well, in the Interstate Commerce Act of 1887, § 20(9), now 49 U.S.C.A. § 20(9). That § 2 of the Expediting Act has not been interpreted to cover these mandamus suits is indicated by United States v. Munson S. S. Line, D.C.Md.1929, 33 F.2d 211, affirmed 4 Cir., 1930, 37 F.2d 681,

affirmed 1931, 283 U.S. 43, 51 S.Ct. 360, 75 L.Ed. 830, in which a suit by the Attorney General under § 20(9) was heard first in the district court, then appealed to the Circuit Court of Appeals for the Fourth Circuit, and finally heard on certiorari in the Supreme Court with no discussion whatsoever of the jurisdictional question. In light of the policy objectives of the Expediting Act, we conclude that these proceedings were not to be brought into the class of those entitled to accelerated review merely because the Attorney General had the sole authority to seek their enforcement. Accordingly, we hold that these appeals are properly before this court.

II.

■ The information requested by the Commission was to be submitted in "special reports" pursuant to § 6(b) of the Federal Trade Commission Act, 15 U.S.C.A. § 46(b), which is set forth in the margin.[6] St. Regis contends that the Commission's authority to require special reports under § 6(b) does not extend to antitrust investigations but is limited to discovery of unfair competitive practices under § 5 of the Act and violations of court or agency decrees entered under that section.

In United States v. Morton Salt Co., 1950, 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401, the Supreme Court upheld a Commission order requiring corporations to file reports showing how they had complied with an earlier order of the Commission. The respondent corporation in that case contended that § 6(b) could be used only in aid of the Commission's power to compile information for gen-

6. Sec. 6:
  "The Commission shall also have power * * * (b) To require, by general or special orders, corporations engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, or any class of them, or any of them, respectively, to file with the commission in such form as the commission may prescribe annual or special, or both annual and special, reports or answers in writing to specific questions, furnishing to the commission such informa-

tion as it may require as to the organization, business, conduct, practices, management, and relation to other corporations, partnerships, and individuals of the respective corporations filing such reports or answers in writing. Such reports and answers shall be made under oath, or otherwise, as the commission may prescribe, and shall be filed with the commission within such reasonable period as the commission may prescribe, unless additional time be granted in any case by the commission."

eral economic surveys under §§ 6(a) and 6(f) and was independent of the enforcement procedures set forth in § 5. The court rejected this contention and held that § 6 could be used for "any purpose within the duties of the Commission, including a § 5 proceeding." 338 U.S. at page 649, 70 S.Ct. at page 367. Since § 5 "minimally * * * registers violations of the Clayton and Sherman Acts," Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 609, 73 S.Ct. 872, 880, the § 6 powers are available to the Commission in precomplaint antitrust proceedings as well.

The respondents here maintain, however, that the statement in Morton Salt, insofar as it authorizes antitrust investigations, should be read as referring to §§ 6(c), (d), and (e) which explicitly delegate to the Federal Trade Commission the following duties: at the behest of the Attorney General to investigate compliance with antitrust decrees; upon the direction of the President or either House of Congress to investigate alleged violations of the antitrust acts; and upon application by the Attorney General to recommend readjustments in the business of any corporation alleged to be violating the antitrust acts. These investigations, when carried out by the use of the usual discovery tools provided for in § 9, it is argued, constitute the limit of the Commission's authority with regard to the antitrust acts. The legislative history of the statute, as well as reasonable statutory construction, belie these contentions.

It is clear from the House and Senate reports that the purpose of § 6 was to give the Commission the powers with respect to investigating and reporting on antitrust matters that were previously committed to the Bureau of Corporations in the Department of Commerce. In the form first passed by the House [7] § 3 of the Act expressly transferred these functions, and § 9 required corporations of a minimum size to furnish annual and special reports and such information, state-ments, and records relating to organization, financial condition, and relation to other corporations as the Commission would require. Section 16 then gave the Commission subpoena powers identical to those given to the Interstate Commerce Commission by the Act of 1887. The report accompanying the Committee draft of the bill, H.R.Rep. No. 533, 63d Cong., 2d Sess. (1914), said that while the investigative powers which had been given to the Bureau of Corporations had been extensive, "there was a failure specifically to require the regular gathering of certain most important kinds of information through the medium of annual reports from industrial corporations engaged in interstate commerce." Id. at 2. The report requirement, together with a $100-a-day penalty for default, was therefore incorporated into the then § 9. The Senate, in proposing an entirely new draft,[8] authorized the Commission in its § 3(b) to require corporations to furnish information and records concerning their business and their relations to other corporations and to produce for examination all papers relating to the commerce in which the corporations under inquiry were engaged. In addition, § 3(c) authorized the Commission to require annual and special reports, and § 8 gave it the investigative powers possessed by the Interstate Commerce Commission. These powers of investigation were said to be "not greatly in excess of those possessed and for years exercised by the Bureau of Corporations." S.Rep. No. 597, 63d Cong., 2d Sess. 12 (1914). Thus, both versions agreed in giving the Commission power to investigate by requiring annual and special reports as well as by ordering records to be produced.

In conference, however, these powers were merged into §§ 6(a) and 6(b), and the subpoena power was spelled out in § 9.

The House conferees' report said:

"The Bureau of Corporations is abolished, as in the House Bill, and

---

7. H.R. 15613, 63d Cong., 2d Sess. (1914).

8. S. 1460, 63d Cong., 2d Sess. (1914).

its powers are conferred on the Commission. Instead of transferring them by reference to the original act creating the bureau, as in section 3 of the House Bill, they are explicitly set out in section 6, paragraph (a), of the bill as agreed to by the conferees. This has been done because the bill now gives to the Commission certain powers which so continuously and directly concern the business interests of the country that it is desirable to have the law show on its face its exact extent and application." H.R.Rep. No. 1142, 63d Cong., 2d Sess. 18 (1914).

The report manifests quite clearly Congress' intent to have the Commission assume the powers of the Bureau of Corporations and its expression of that intent in §§ 6(a) and 6(b).

Moreover, there is no indication in the statute that antitrust investigations are in any way distinguishable procedurally from investigations directed at uncovering violations of the unfair-competition aspect of § 5. The detailed enumeration of duties in §§ 6(c), (d) and (e) neither expressly nor impliedly denies the Commission the power to proceed upon the request of the Attorney General, President, or Congress by use of the powers granted by § 6(b); the inclusion of all these provisions within one section of the statute suggests the contrary. And if the Commission may investigate charges of antitrust violations filed by Congress or the President by directing that annual or special reports be filed, it would be anomalous to deny it the use of these same techniques when it is exercising its own obligation under § 11 of the Clayton Act to police violations of § 7. We therefore hold that the Commission is empowered under § 6(b) to require reports with respect to investigations into possible violations of the antitrust laws.

No challenge has been made by the appellants to the scope of the Commission's order, so we do not now undertake to decide whether § 6(b) and § 9 provide alternative routes or whether only material which cannot be reached by the subpoena power of § 9 may be demanded in a § 6(b) order.

### III.

Among other papers which the Commission directed be produced by St. Regis and its affiliates were copies of various schedules submitted to the Bureau of Census for the 1954 and 1958 Census of Manufactures, the 1955, 1956, and 1957 Surveys of Manufactures, and correspondence relating thereto. The respondents did not contend that copies were not available but maintained instead that ordering their production violated the confidentiality provision of § 9 of the Census Act, 13 U.S.C. § 9.[9] However, the plain terms of that statute apply only to the Department of Commerce and do not bar any other federal agency from divulging such information if it comes from different sources or from demanding that a copy remaining in the respondent's files be produced. The purpose of the prohibition addressed to the Secretary of Commerce and his staff in the Census Act is served if they are denied the power to transmit submitted information to other governmental agencies or to individuals. But there is no reason to protect absolutely the underlying data or to insulate the source of the information from any further inquiry. The manufacturer is under no statutory obligation to hold a copy of his submitted schedule in his files; if he chooses in this way to keep a summary of

9. "Neither the Secretary, nor any other officer or employee of the Department of Commerce or bureau or agency thereof, may, except as provided in section 8 of this title—

"(1) use the information furnished under the provisions of this title for any purpose other than the statistical purposes for which it is supplied; or

"(2) make any publication whereby the data furnished by any particular establishment or individual under this title can be identified; or

"(3) permit anyone other than the sworn officers and employees of the Department or bureau or agency thereof to examine the individual reports."

information which is scattered throughout his records, the particular paper on which the data is collected is no more immune from ordinary discovery procedures than any other document in his possession. Although the Census Bureau printed across the bottom of the copy page, "Keep This Copy For Your Files," there was, in fact, no obligation on the respondents to do so. Clearly the Census Bureau's action cannot confer any immunity on such records through gratuitous suggestion. We agree with the district court that the protection afforded income tax returns under § 6103 of the Internal Revenue Code of 1954, 26 U.S. C.A. § 6103, presents a close analogy. The originals of such returns are confidential, but copies retained in the taxpayer's files are subject to subpoena. E. g., United States v. O'Mara, D.C.D.C. 1954, 122 F.Supp. 399. We disagree with the Seventh Circuit's decision regarding this same issue in F. T. C. v. Dilger, 7 Cir., 1960, 276 F.2d 739, certiorari denied 81 S.Ct. 171.

## IV.

■ We turn now to the question whether, under the circumstances, the statute required the district judge to assess a penalty of $100 against St. Regis for each day on which it was in default in filing the requested reports. The district court decided that although the Commission had the power to issue the orders, some of the questions propounded and requests made were too vague to be enforced. Finding authorization to modify enforcement of the orders in § 6(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1005(c), Judge Ryan directed that only the enforceable questions be answered. Cf. N. L. R. B. v. Anchor Rome Mills, Inc., 5 Cir., 1952, 197 F.2d 447. He held, however, that the forfeiture provided in § 10 of the Federal Trade Commission Act was "sufficiently analogous to a criminal sanction" [181 F.Supp. 867] to justify applying to it the requirements of clarity and certainty ordinarily demanded of criminal penalties. Since approximately twelve per-

cent of the questions asked in all the orders were held to be vague and uncertain, the district judge refused to assess the $100-a-day penalties demanded by the United States.

The United States appeals only from the refusal to assess penalties and does not dispute Judge Ryan's decision that twenty-eight questions were too vague to be answered. Thus, the only question before us on the appeal of the United States is whether the district court committed error in dismissing the government's claim for statutory penalties.

Were this a case involving a single oversight or an honest mistake in a good-faith attempt to comply with the Commission's order, the statute's absolute and imperative terms would not prevent us from assuming that it could not have been Congress' intent so severely to punish an innocent offender. United States v. Northern Pac. Ry., 1916, 242 U.S. 190, 37 S.Ct. 22, 61 L.Ed. 240; see Kerr S.S. Co. v. United States, 2 Cir., 1960, 284 F.2d 61, 63. The facts before us, however, suggest no such mitigating circumstances. The respondents cannot claim that theirs was merely an honest omission since they refused to accede to many of the Commission's requests for documents and information on the sole ground that the Commission had no authority to demand what was requested. That the respondent's recalcitrance was caused by a wrong guess on a disputed issue of law does not prevent it from being held to "lawful consequences attached to the refusal." Life & Cas. Ins. Co. v. McCray, 1934, 291 U.S. 566, 574, 54 S.Ct. 482, 486, 78 L.Ed. 987; see United States v. Clyde S.S. Co., 2 Cir., 1929, 36 F.2d 691; F. T. C. v. Maynard Coal Co., 1927, 57 App. D.C. 297, 22 F.2d 873.

The respondents argue, however, that the reports demanded by the Commission in the present case consisted of questions directed at particular information, and that a comparison of § 6(b) with § 10 discloses that although the Commission is empowered to order the filing of "answers in writing to specific questions" as well as annual or special reports, it is

only the failure to file reports which is penalized by § 10. In support of this contention we are urged to consider the decision in United States v. National Biscuit Co., D.C.S.D.N.Y.1938, 25 F.Supp. 329.

The information requested by the Commission is indeed much like that demanded in the National Biscuit Co. case, F. T. C. v. National Biscuit Co., see D.C., 18 F.Supp. 667, at pages 669–670, but it is by no means certain that we would have agreed with the district court's disposition of that case had it been appealed. On the facts of this case we cannot say that the orders directed at St. Regis were requests for "answers to specific questions" rather than demands for reports. The line between the two is, by the nature of each, quite indistinct. Reports that are demanded by the Commission will necessarily be addressed towards more-or-less specific inquiries. A compliance report conveys details concerning activity undertaken pursuant to an order; an investigation report divulges facts concerning suspected violations. It would be totally unreasonable to withdraw from the Commission the coercive effect of the § 10 penalty whenever it makes its wants known in detail but permit it to use the threat of a mounting forfeiture so long as it cloaks the foci of inquiry behind general language. Although it is entirely reasonable to read the statute so as not to fine one who has failed only to respond to one or several specific interrogatories and to remit the Commission to a suit in mandamus for enforcement of such a request, when the quantity of interrogatories reaches the proportions of those in this case and the request is made pursuant to a full investigation of a respondent's course of conduct, the cumulative effect of all the questions is substantially that of a request for a report.

█ The respondents further urge that infliction of the penalty would violate the due process clause of the Fifth Amendment since they would be unable, under F. T. C. v. Claire Furnace Co., 1927, 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978, to test the validity of the order save by waiting and defending the suit in mandamus, with penalties accumulating all the while. If judicial review were in fact limited to enforcement proceedings instituted by the Commission, and a daily forfeiture were collected for a failure to comply, the procedure might not meet the established standards of due process. Cf. Oklahoma Operating Co. v. Love, 1920, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596. However, the Claire Furnace case was decided before either the Declaratory Judgment Act of 1934, 48 Stat. 955, or the Administrative Procedure Act of 1946, 60 Stat. 237, was enacted. Mr. Justice Jackson, speaking for a unanimous Court in United States v. Morton Salt Co., 338 U.S. 632, 654, 70 S.St. 357, 94 L.Ed. 401, intimated broadly that Claire Furnace should not stand in the way of declaratory relief or prompt review if that be necessary to rescue the penalty provision from attack under the Fifth Amendment. We hold that under the declaratory-judgment statute as it now stands, 28 U.S.C. § 2201, a proceeding brought to test the validity of an administrative agency's demand for a special annual report, when daily penalties may be assessed for failure to comply with any valid request, amounts to a "case of actual controversy" and is within the jurisdiction of the United States district courts. The respondent bringing such an action would be effectively denied judicial review if he is permitted no forum in which to challenge the validity and scope of the agency's order; his injury, therefore, is immediate enough to warrant judicial intervention even if the agency is not prepared to institute court proceedings to achieve compliance. Since the statute confers discretion on the courts to act when the injury is irremediable, Public Service Commission v. Wycoff Co., 1952, 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291; Eccles v. Peoples Bank of Lakewood Village, 1948, 333 U.S. 426, 434, 68 S.Ct. 641, 92 L.Ed. 784, and since the controversy between the parties is clear, and the potential injury to the respondent is evident, the exercise of

equitable discretion is appropriate. Moreover, it is only if such a remedy is available that the forfeiture sanction can withstand attack on due process grounds.

We are also of the opinion that a remedy was available to St. Regis under § 10(c) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(c). The investigatory order authorized by § 6(b) of the Federal Trade Commission Act may not satisfy the statutory definition of "order" in § 2(d) of the Administrative Procedure Act, 5 U.S.C.A. § 1001(d), since it may not be a "final disposition." However, the order amounts to a "sanction" under § 2(f) since nonperformance of the Commission's demand entails a penalty of $100 a day, and the directive therefore constitutes "compulsory or restrictive action."

The availability of this relief also mitigates the dilemma which our decision here imposes upon district judges. Although modification of an agency's order under § 6(c) of the Administrative Procedure Act results in the most efficient treatment of a partially void order, it carries with it the imposition of penalties for prior noncompliance. A district judge might believe that the assessment of a forfeiture would be unfair in light of the substantial defects in the agency's order, and might thus be encouraged merely to deny the petition for mandamus thereby forcing the agency to re-issue the valid portions of its order. Whether, as a result of § 6(c) of the Administrative Procedure Act, such a total refusal may be sustained is a question which hinges on the construction of the word "subpoena" in the statute, and we do not decide it here. In view of the opportunity given to a respondent to attack an order requesting a special report by a declaratory-judgment proceeding, the exaction of the statutory penalties for noncompliance is fair in any case in which the respondent awaits a mandamus action before contesting the agency's demands, and the order is held valid.

■ Finally, we agree with Judge Ryan's decision—which the United States has not disputed in its briefs— that only one course of conduct was being investigated and that the second order issued to St. Regis was merely supplementary to the first. Thus, only one penalty of $100 should be assessed for each day of noncompliance.

The judgment below is, therefore, reversed insofar as it dismissed the demand for penalties under § 10 of the Federal Trade Commission Act, and the case is remanded with instructions to enter judgment for the United States in the amount of $100 a day for each day on which St. Regis was in default of the first order requiring a special report.

FRIENDLY, Circuit Judge (concurring).

I join in Chief Judge LUMBARD'S disposition of the many issues in this case. But I see little basis and less occasion for the statement that the availability of methods for securing an early determination of the validity of a direction under § 6(b) of the Federal Trade Commission Act, pursuant to statutes passed long afterwards, necessarily renders exaction of the statutory penalties "fair" in any case where the respondent has not chosen to use them. If he prefers to await suit and then succeeds in demonstrating such extensive invalidity that there is no longer an intelligible requirement for an "annual or special report," he is entitled to prevail. Per contra his utilization of the Declaratory Judgment Act or the Administrative Procedure Act will not avail him if he proves wrong, save, of course, for such periods as the direction has been stayed.