UNITED STATES *v.* MUNSON STEAMSHIP LINE.

No. 85.   Argued March 2, 1931.—Decided March 23, 1931.

44

*Assistant to the Attorney General O'Brian,* with whom *Solicitor General Thacher* and *Messrs. Charles H. Weston,* Special Assistant to the Attorney General, and *Erwin N. Griswold* were on the brief, for the United States.

*Mr. W. Calvin Chesnut,* with whom *Messrs. Frank Lyon* and *Irving L. Evans* were on the brief, for respondent.

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

The Government instituted this proceeding, at the request of the Interstate Commerce Commission, under § 20, subdivision (9), of the Interstate Commerce Act,[1] for a mandamus to compel the Munson Steamship Line

---

[1] U. S. Code, Tit. 49, § 20 (9).

to file schedules covering rates and charges for transportation of goods by water from Baltimore, Maryland, to ports in Florida, upon the ground that the property was being transported partly by rail and partly by water under a common arrangement for continuous carriage and shipment from interior points to the Florida ports. The respondent's answer alleged that the transportation on its part consisted of an independent water movement with respect to which the filing of tariffs was not required. On a trial before the court and a jury, the District Judge directed a verdict for the respondent, 33 F. (2d) 211, and the judgment entered accordingly was affirmed by the Circuit Court of Appeals. 37 F. (2d) 681. The Government was granted a writ of certiorari.

The facts, as found by the courts below upon evidence substantially undisputed, may be summarized as follows: The respondent operates a line of steamers from Baltimore, Maryland, to Jacksonville and Miami, Florida. It accepts from rail carriers at Baltimore goods which have been transported from inland points and carries them to the Florida ports. The transportation is not covered by through bills of lading or by through or joint rates, and there is no agreement for the division, and no customary division, of rates between the respondent and the rail carriers. The goods are shipped by rail to Baltimore in care of, or with direction to notify, the respondent, and the name of the ultimate consignee in Florida is noted on the rail bill of lading. That bill shows Baltimore as the destination of the shipment. The shipper sends the rail bill of lading to the respondent with instructions as to the ultimate consignee. Upon the arrival of the goods at Baltimore, the rail carrier sends an arrival notice to the respondent; the latter advises the rail carrier of the ship which will transport the goods to Florida, and the goods are delivered to the respondent. The rail bill of lading is surrendered to the rail carrier, the charges of that carrier, unless they have been prepaid, are paid by the respond-

ent, which then issues its own bill of lading to the shipper, specifying its freight rate for the transportation of the goods by water from Baltimore to the point of destination in accordance with the separate advice which the respondent has received from the shipper. Upon delivery of the goods in Florida, the respondent collects from the consignee its own charges and also the rail charges which it has advanced, but the latter are collected, not as agent for or under any agreement with, the rail carrier, but because they have been advanced as an incident to the carrying out of the contract between the respondent and the shipper.

The question relates solely to the application of § 6 (1) of the Interstate Commerce Act providing for the filing of tariffs with the Interstate Commerce Commission. The requirement of the Shipping Act,[2] with which the respondent is said to have complied, as to filing tariffs with the United States Shipping Board, is not involved. Nor is any question presented under § 6 (13)[3] of the Interstate Commerce Act, added by the Panama Canal Act.[4] The provision of § 6 (1) of the Interstate Commerce Act applies to common carriers as these are described in § 1 of that Act, and the particular description with which we are here concerned is found in subdivision (1) (a) of that section relating to common carriers engaged in

"(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment."[5]

---

[2] U. S. Code, Tit. 46, § 817.

[3] U. S. Code, Tit. 49, § 6 (13).

[4] Act of August 24, 1912, c. 390, 37 Stat. 560, 568. See *Chicago. Rock Island & Pacific Ry. Co.* v. *United States*, 274 U. S. 29, 36; *United States* v. *New York Central R. Co.*, 272 U. S. 457, 462.

[5] U. S. Code, Tit. 49, § 1 (1) (a). Compare Act of February 4, 1887, c. 104, § 1, 24 Stat. 379; Act of June 29, 1906, c. 3591, § 1, 34

The Government concedes that the respondent was not required to file tariffs with the Commission "unless it was engaged in continuous interstate rail and water shipments pursuant to a common control, management, or arrangement" and that "there was no common control or management between respondent and the connecting railroads." The question is thus the narrow one whether there was a "common arrangement" for the rail and water shipment within the meaning of the statute.

It is apparent that a mere practical continuity in the transportation is not enough, as the question under the statute is not simply whether there was a continuous carriage or shipment, but whether that carriage or shipment was pursuant to a common arrangement.[6] The provision of the statute, expressing a distinction in the policy of the Congress with respect to water transportation, clearly indicates that it is permissible for a water carrier, receiving at its port a shipment which has been carried by rail from an interior point, to keep its own carriage distinct and independent. While a common arrangement may exist without the issue of a through bill of lading or any particular formality,[7] it is not to be inferred from circumstances which are entirely consistent with the independence which the statute recognizes. In this instance, the facts show that the respondent undertook to maintain its own carriage as distinct and independent by having its separate contract, its independent rate, its direct instructions from the shipper as to its own transportation. The fact that the respondent advised the rail carrier of the

Stat. 584; Act of June 18, 1910, c. 309, § 7, 36 Stat. 539, 544, 545; Transportation Act, 1920, § 400, 41 Stat. 456, 474.

[6] See *Ex parte Koehler*, 30 Fed. 867, 869, 870; *Mutual Transit Co.* v. *United States*, 178 Fed. (C. C. A. 2d) 664, 666, 667.

[7] *Cincinnati, New Orleans & Texas Pac. Ry. Co.* v. *Interstate Commerce Commission*, 162 U. S. 184, 193; *Baer Brothers Mercantile Co.* v. *Denver & Rio Grande R. Co.*, 233 U. S. 479, 491.

sailings of its ships, the place where goods would be received, and the amount of its charges for the water transportation, manifestly did not constitute a common arrangement with the railroad for that transportation. The respondent could take delivery and pay the rail charges upon delivery without sacrificing its right to make, as it did make, its own separate contract directly with the shipper pursuant to which the goods were received and the payment made. The Government stresses the fact that circulars were issued by the railroads as to the respondent's method of shipping and that shippers were generally informed as to the way in which shipments from interior points destined to Florida ports would be handled. But this information merely gave the facts and did not alter the transaction. The respondent did not forfeit its independence merely by making its service convenient, still less by advising both the railroads and shippers of the terms of its service.

*Judgment affirmed.*