UNITED STATES of America,
Appellant,

v.

MISSISSIPPI VALLEY BARGE LINE
COMPANY, Appellee.

MISSISSIPPI VALLEY BARGE LINE
COMPANY, Appellant,

v.

UNITED STATES of America,
Appellee.

Nos. 16400, 16409.

United States Court of Appeals
Eighth Circuit.

Dec. 27, 1960.

Sherman L. Cohn, Atty., Civil Div., Dept. of Justice, Washington, D. C., for the United States. George Cochran Doub, Asst. Atty. Gen., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., and William H. Webster, U. S. Atty., St. Louis, Mo., were with Sherman L. Cohn, Washington, D. C., on the brief filed by the Government.

John O. Hichew, St. Louis, Mo., for the Mississippi Valley Barge Line Co. J. Richard Skouby, and Thompson, Mitchell, Douglas & Neill, St. Louis, Mo., were with John O. Hichew, St. Louis, Mo., on the brief filed for the Mississippi Valley Barge Line Co.

Before SANBORN, MATTHES and BLACKMUN, Circuit Judges.

BLACKMUN, Circuit Judge.

Mississippi Valley Barge Line, a common carrier by water in interstate commerce, instituted this action in July 1957, asserting jurisdiction under the Tucker Act and, specifically, under 28 U.S.C. §§ 1346 and 1337, against the United States for unpaid portions of charges for shipments of government freight in 1956 and 1957. The United States by its amended answer conceded liability for these charges but, by permissive counterclaims filed under Rule 13(b), F.R.Civ.Proc., 28 U.S.C., alleged offsetting liability on the part of the Barge Line for damages to other government property transported by it in two 1955 shipments.

The 4 shipments involved, so far as they concern the actual water transportation by the Barge Line, are:

| Shipment | From | To |
|---|---|---|
| January 10, 1955 | Baton Rouge, La. | Memphis, Tenn. |
| February 17, 1955 | Baton Rouge, La. | Memphis, Tenn. |
| July 19, 1956 | Rock Island, Ill. | New Orleans, La. |
| March 4, 1957 | New Orleans, La. | Memphis, Tenn. |

The Government paid the 1955 charges in full. It paid the 1956 and 1957 charges only in part. The portions it did not pay equate with the alleged damages to the respective 1955 shipments and are the subject of the Barge Line's present suit.

The District Court entered judgment for the Barge Line for only the unpaid portion of the 1956 shipment but allowed interest thereon at 6% per annum. Both sides have appealed.

The case was submitted upon exhibits and stipulated facts. Each of the 1955 shipments originated at an off-river point known as Sharpe Station near Baton Rouge. It moved from that point by the Illinois Central Railroad about 7 miles to the Port of Baton Rouge. There the Greater Baton Rouge Port Commission, a municipal and state agency, unloaded the shipment from the rail cars and reloaded it on the plaintiff's barges. The Barge Line then transported the shipment by water to Memphis where Mississippi Valley Stevedoring Company, the Barge Line's wholly owned subsidiary, unloaded it from the barges and placed it on other rail cars. The Illinois Central then again transported the shipment about 4½ miles to Memphis General Depot which was another off-river point and the ultimate destination.

The damage (the amount of which is not in contest) to the February 1955

shipment consisted principally of a cut automobile tire and was discovered when this shipment was being discharged from the barge at Memphis. The damage to the January 1955 shipment (the monetary measure of which has not yet been resolved) was discovered only upon arrival at Memphis General Depot. No unusual incident occurred during the water transportation which would have caused the damages and the time, place and cause of the losses are unknown.

Each of the 1955 shipments moved under government form bills of lading. Each of these named the Barge Line in a lead space entitled "Name of Initial Transportation"; each described the shipment as one from "Sharpe Station, Baton Rouge, Louisiana" and from "Transportation Officer, Baton Rouge Engineer Depot"; each named "Memphis, Tennessee" as the destination and the consignee as "T. O. Memphis General Depot"; each recited that the pickup service at the origin was not by the Government or its agent; each routed the shipment "Via" the Barge Line and mentioned no other rail or water carrier; each also described the Barge Line as the "Name of Transportation Company"; each contained a Consignee's Certificate of Delivery signed by the transportation officer in favor of the Barge Line as the "Transportation Company" and "Memphis, Tennessee" as the "Actual Point of Delivery"; each recited that switching charges and handling charges "at point of origin and destination will be advanced by Mississippi Valley Barge Line"; and each stated that the shipment was unloaded from the barge and "switched" by the Illinois Central to Memphis General Depot. On its reverse side each bill contained Administrative Directions that "Government property will be transported on the prescribed form of Government bill of lading" and that through bills "will be issued in all instances between initial and ultimate points" except where more advantageous rates could be secured, and a Condition that "Unless otherwise specifically provided or otherwise stated hereon, this bill of lading is subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier."

These government bills also contained the following recital: "Received by the transportation company named above, subject to conditions named on the reverse hereof, the public property hereinafter described, in apparent good order and condition (contents and value unknown), to be forwarded to destination by the said company and connecting lines, and to be delivered in like good order and condition to said consignee".

The Illinois Central issued Miscellaneous Bills to the Barge Line for the railroad's services in the transportation of the January 1955 shipment from Baton Rouge Engineer Depot "to Miss. Valley Barge" and other invoices for its movement of the shipment from Memphis to Memphis General Depot. The Baton Rouge Port Commission also sent the Barge Line an invoice covering its handling charges for the January shipment. Similar Miscellaneous Bills and invoices were issued by the railroad and the Commission to the Barge Line for the February 1955 shipment. In addition, the railroad issued at Baton Rouge straight bills of lading for that shipment; each of these was directed to the Barge Line, stated "switching charges to be billed to Mississippi Valley Barge Lines", and was stamped "shipper's load and count". The dates on the respective Baton Rouge instruments indicate that each shipment had moved to the docks there before the government bills of lading were issued. The Barge Line advanced and paid all switching and handling charges on the 1955 shipments.

The two shipments moved under Rate B of the Barge Line's filed Freight Tariff 25-C, I.C.C. 101. This recited that except as otherwise provided "rates named herein apply f.o.b. barge at origin to f.o.b. barge at destination" and that Rate B did not include switching and handling charges at origin and destination advanced by the Barge Line. The Tariff rates related only to water transporta-

tion. B rates included "only limited liability" and it was stated that "carrier will act as customer's agent only in making arrangements for loading, unloading or otherwise handling of shipments to or from barges, and carrier shall not be liable for any loss or damage to goods during loading, unloading or handling beyond that provided for in * * * this Tariff". The Tariff then stated that the "carrier shall be liable as at common law for any loss of, or damage to, the shipment herein described, except as hereinafter provided"; certain liabilities were then described which did not coincide with the liability of a common carrier by water under common law.

The Tariff also included the Barge Line's form of straight bill of lading. This recited that "Unless otherwise indicated by endorsement hereon, the said shipment has been loaded by the shipper and the contents, quality, quantity and condition of the shipment and the packages, if any, are unknown".

At the trial the Government argued that the Barge Line was the "receiving" or "initial" carrier within the meaning of the Carmack Amendment [1] to the Interstate Commerce Act;[2] that it is therefore liable for shipment damage even though it may not have occurred during the Barge Line's segment of the transportation; that under Section 4 [3] of the Harter Act of 1893 the recital in each government bill that the 1955 shipments had been received "in apparent good order and condition" established a prima facie case to that effect for the Government; and that, in the alternative, the Barge Line had *agreed* to transport the goods all the way from origin to destination and thus was liable for the damages as a matter of contract. The Barge Line defended on the theory that the Illinois Central was the receiving carrier under Carmack; that the railroad and not the Barge Line thus incurred the liabilities statutorily presumed for the receiving carrier; and that the Barge Line did not

1. 34 Stat. 593, as amended, now found as 49 U.S.C.A. § 20(11):

"Any common carrier, railroad, or transportation company subject to the provisions of this chapter receiving property for transportation from a point in one State * * * to a point in another State, * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States * * * when transported on a through bill of lading, * * * and any such common carrier, railroad, or transportation company * * * so receiving property * * * or any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such prop-

erty may be delivered or over whose line or lines such property may pass within the United States * * * when transported on a through bill of lading, * * * *Provided*, That if the loss, damage, or injury occurs while the property is in the custody of a carrier by water the liability of such carrier shall be determined by the bill of lading of the carrier by water and by and under the laws and regulations applicable to transportation by water, and the liability of the initial or delivering carrier shall be the same as that of such carrier by water: * * * *Provided further*, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under the existing law: * * * *And provided further*, That for the purposes of this paragraph * * the delivering carrier shall be construed to be the carrier performing the line-haul service nearest to the point of destination and not a carrier performing merely a switching service at the point of destination: * * * "

2. 24 Stat. 379, as amended, now found in 49 U.S.C.A.

3. 27 Stat. 445, now 46 U.S.C.A. § 193.

contract for a through shipment of the goods and, indeed, could not inasmuch as it had no authority so to do under its Tariff.

The District Court concluded that under Carmack the initial carrier is the one first receiving the goods; that the Illinois Central was the initial carrier here and subject to the statutory liabilities; that, in contrast, the Barge Line was a connecting carrier and its liability was to be determined upon common law principles; and that the application of the common law resulted in liability of the Barge Line for the damage discovered with respect to the February 1955 shipment upon its discharge from the barge but also resulted in no liability on the part of the Barge Line for the damage to the January 1955 shipment discovered only after the rail transportation to Memphis General Depot. As a consequence the Court dismissed the Government's counterclaim based on the February shipment.

The Barge Line now concedes that the District Court erred in allowing interest. In view of the provisions, applicable here, of § 1302 of the Supplemental Appropriation Act of July 27, 1956, 70 Stat. 694, 31 U.S.C.A. § 724a,[4] we hold this concession to be a proper and required one [5] and itself to compel modification of the judgment.

On these appeals the parties otherwise press the same arguments but the Barge Line now urges, apparently for the first time, that the Carmack Amendment cannot apply to the 1955 shipments. It says this is so because Carmack is a part of and applicable only to Part I of the Interstate Commerce Act and, under the very first section of that Act,[6] Part I (or Chapter 1) is applicable to common carriers engaged in the transportation of property partly by railroad and partly by water only when under a "common arrangement"; that there was no common arrangement for the rail and water facilities here; that under § 1(2) (c) [7]

4. § 724a. "There are appropriated, out of any money in the Treasury not otherwise appropriated, and out of the postal revenues, respectively, such sums as may on and after July 27, 1956 be necessary for the payment, not otherwise provide (sic) for, as certified by the Comptroller General, of judgments (not in excess of $100,000 in any one case) rendered by the district courts and the Court of Claims against the United States which have become final, together with such interest and costs as may be specified in such judgments or otherwise authorized by law: *Provided,* That, whenever a judgment of a district court to which the provisions of section 2411(b) of Title 28, *apply, is payable from this appropriation,* interest shall be paid thereon only when such judgment becomes final after review on appeal or petition by the United States, and then only from the date of the filing of the transcript thereof in the General Accounting Office to the date of the mandate of affirmance (except that in cases reviewed by the Supreme Court interest shall not be allowed beyond the term of the Court at which the judgment was affirmed) * *". 28 U.S.C.A. § 2411(b) relates to judgments in actions instituted under 28 U.S. C.A. § 1346.

5. See, also, United States v. Alcea Band of Tillamooks, 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738; United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 588, 67 S.Ct. 398, 91 L.Ed. 521; United States v. N. Y. Rayon Importing Co., 329 U.S. 654, 658, 661, 67 S.Ct. 601, 91 L.Ed. 577; 28 U.S.C.A. § 2516 (a); and 28 U.S.C.A. § 1346(a) (2) making district court jurisdiction in the limited area in which this case falls concurrent with that of the Court of Claims.

6. 49 U.S.C.A. § 1:
"(1) The provisions of this chapter shall apply to common carriers engaged in—
"(a) The transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment; * *"

7. 49 U.S.C.A. § 1:
"(2) The provisions of this chapter * * * shall not apply— * * *
"(c) To the transportation of passengers or property by a carrier by water where such transportation would not be subject to the provisions of this chapter

Part I is specifically inapplicable to the transportation of property by a water carrier where that carrier merely absorbs a railroad's switching and handling charges; that it follows, *a fortiori* that the Barge Line's advance of the switching and handling charges, which is less significant than its absorption of them would be, does not subject it to regulation under Part I; and that the Barge Line, instead, is subject to regulation under Part III [8] of the Act.

The government's reply to this new argument is by way of a suggestion (although raised only as a response in its reply brief and not vigorously advanced) that if, as plaintiff claims, the Barge Line's shipments were entirely by water and Carmack is inapplicable, then (a) the Barge Line's claims for freight charges are maritime in nature, (b) its complaint should have been brought under the Suits in Admiralty Act [9] rather than under the Tucker Act and (c) the complaint is dismissible for want of jurisdiction.

 We first consider this suggestion as to jurisdiction. There is no ques-tion, of course, that (a) where a claim of want of jurisdiction is of the subject matter, it may be considered, and appropriate judgment given, at any stage of the proceedings, that is, either in the trial court or on appeal; [10] (b) the burden is on the Barge Line as plaintiff to allege and prove that its causes of action are within the jurisdiction of the court; [11] (c) litigants cannot establish jurisdiction of a federal court by stipulation, consent or waiver; [12] (d) the remedy afforded by the Suits in Admiralty Act against the United States is exclusive; [13] and (e) a contract for the carriage of goods wholly by water is a maritime contract and an action for the water freight charges falls within admiralty jurisdiction. [14]

We are not prepared, however, to pronounce, on the record before us, that the plaintiff's complaint on its face, the averments of which are admitted by the Government, does not establish Tucker Act jurisdiction or, in contrast, that it does establish Suits in Admiralty Act jurisdiction, and requires a dismissal. [15] Because the case is to be remanded for

---

except for the fact that such carrier absorbs, out of its port-to-port water rates or out of its proportional through rates, any switching, terminal, lighterage, car rental, trackage, handling, or other charges by a rail carrier for services within the switching, drayage, lighterage, or corporate limits of a port terminal or district."

8. 49 U.S.C.A. § 901 et seq., concerning water carriers.

9. 41 Stat. 525, now found as 46 U.S.C.A. §§ 741–752.

10. Matson Navigation Co. v. United States, 284 U.S. 352, 359, 52 S.Ct. 162, 76 L.Ed. 336; United States v. Corrick, 298 U.S. 435, 440, 56 S.Ct. 829, 80 L.Ed. 1263; Kern v. Standard Oil Company, 8 Cir., 228 F.2d 699, 701; Rule 12(h) F.R.Civ.Proc.

11. Matson Navigation Co. v. United States, supra, at page 359 of 284 U.S., at page 165 of 52 S.Ct.

12. United States v. Griffin, 303 U.S. 226, 229, 58 S.Ct. 601, 82 L.Ed. 764; Mitchell v. Maurer, 293 U.S. 237, 244, 55 S.Ct. 162, 79 L.Ed. 338.

13. United States Shipping Board Emergency Fleet Corp. v. Rosenberg Bros., 276 U.S. 202, 214, 48 S.Ct. 256, 72 L.Ed. 531; Johnson v. United States Shipping Board Emergency Fleet Corporation, 280 U.S. 320, 327, 50 S.Ct. 118, 74 L.Ed. 451; Brady v. Roosevelt S.S. Co., 317 U.S. 575, 578, 63 S.Ct. 425, 87 L.Ed. 471.

14. Isthmian Steamship Company v. United States, 130 F.Supp. 336, 131 Ct.Cl. 472; United States v. Isthmian S.S. Co., 359 U.S. 314, 79 S.Ct. 857, 3 L.Ed.2d 845.

15. It is of interest to note that the District Court here has jurisdiction of a suit under either act. This is in contrast to the usual situation where the challenge is to the jurisdiction of the court itself as, for example, the Court of Claims in Isthmian Steamship Company v. United States, supra, and Matson Navigation Co. v. United States, supra. Compare, however, Commercial Trust Co. v. United States Shipping Bd. E. F. Corp., 2 Cir., 48 F.2d 113, 114.

further proceedings, we are content to have the District Court at that time consider such further evidence, if any is presented, which bears upon the nature of the plaintiff's causes of action, and, if it concludes that the Suits in Admiralty Act is applicable, to determine in its discretion whether the plaintiff's complaint is to be dismissed, or whether it may or should be appropriately amended, in line with the approach in Weiss v. United States, D.C.D.N.J., 168 F.Supp. 300, and Liberty Mutual Insurance Company v. United States, D.C.E.D.N.Y., 183 F.Supp. 944, 945,[16] having in mind, among other things, the apparent expiration of the limitations period prescribed in Section 5 of the Suits in Admiralty Act, 46 U.S.C.A. § 745, and any possible prejudice to the Government and its counterclaims in the light of the holding in United States v. Isthmian S. S. Co., 359 U.S. 314, 319–322, 79 S.Ct. 857, 3 L.Ed.2d 845.

Not being able to determine this initial question of jurisdiction with finality we pass on to the non-maritime and substantive aspects of the case.

■ It is to be observed preliminarily that where, as here, the case is submitted to the court upon stipulated facts and documentary material and there is no conflict in the evidence, or in the inferences which reasonably can be drawn therefrom, this court may rule upon the questions of law presented and is not restricted by the limitations of Rule 52(a), F.R.Civ.Proc. Sun Insurance Office Limited of London v. Be-Mac Transport Co., 8 Cir., 132 F.2d 535, 536; United States v. Mitchell, 8 Cir., 104 F.2d 343, 346; Stokes v. United States, 2 Cir., 144 F.2d 82, 85.

■ At common law a common carrier is liable for damage occurring during that carrier's transportation. Chesapeake & Ohio Ry. Co. v. Thompson Mfg.

Co., 270 U.S. 416, 421–422, 46 S.Ct. 318, 70 L.Ed. 659; Adams Express Co. v. Croninger, 226 U.S. 491, 509, 33 S.Ct. 148, 57 L.Ed. 314. The liability is, in effect, that of an insurer, Bank of Kentucky v. Adams Exp. Co., 93 U.S. 174, 181, 23 L.Ed. 872; United States v. Savage Truck Line, 4 Cir., 209 F.2d 442, 445, 44 A.L.R.2d 984, certiorari denied 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098; or, as has sometimes been said, there is a conclusive presumption of negligence, Hall & Long v. Nashville & C. Railroad Companies, 13 Wall. 367, 372, 20 L.Ed. 594. The rule is applied to common carriers by water as well as to those by land. The Folmina, 212 U.S. 354, 361, 29 S.Ct. 363, 53 L.Ed. 546. Damage caused by act of God, the public enemy, the inherent nature of the property, the public authority, and the act or default of the shipper are recognized exceptions to this rule of liability. See Secretary of Agriculture v. United States, 350 U.S. 162, 165–166, 76 S.Ct. 244, 100 L.Ed. 173 (footnote). Conversely, and in the absence of a contrary contract, a common carrier's liability for damage is limited to that occurring on its portion of the total transportation. Michigan Cent. Railroad Co. v. Mineral Springs Manufacturing Co., 16 Wall. 318, 324, 21 L.Ed. 297; Michigan Central R. R. Co. v. Myrick, 107 U.S. 102, 106, 1 S.Ct. 425, 27 L.Ed. 325.

■ To establish the common carrier's common law liability the claimant needs initially to show only the carrier's receipt of the goods in apparent good order and their release by the carrier in damaged condition. This establishes a prima facie case and the burden then shifts to the carrier to prove otherwise or to show that the damage is due to an excepted cause. The Folmina, supra, at pages 361, 363 of 212 U.S., at pages 364, 365 of 29 S.Ct.; Schnell v. The Vallescura, 293 U.S. 296, 303–304, 55 S.Ct. 194, 79 L.Ed. 373. A prima facie show-

---

16. Compare Tiller v. Atlantic Coast Line, 323 U.S. 574, 580–581, 65 S.Ct. 421, 89 L.Ed. 465; Levinson v. Deupree, 345 U.S. 648, 652, 73 S.Ct. 914, 97 L.Ed. 1319; Aho v. Jacobsen, 359 U.S. 25, 79 S.Ct. 602, 3 L.Ed.2d 625; and Bowles v. Tanker Gas, D.C.D.Minn., 5 F.R.D. 230, 233, 235.

ing of delivery in good condition is made through a bill of lading, executed by the carrier, containing a recital to that effect. Nelson v. Woodruff, 1 Black 156, 160, 17 L.Ed. 97; Ship Howard &c. et al. v. Wissman, 18 How. 231, 233, 15 L.Ed. 363.

The common law approach was not an easy one for the shipper where connecting carriers were involved. While the goods may have been delivered to the first carrier in good condition and may have been discharged from the last carrier in damaged condition, the determination of where the damage occurred along the segmented route was difficult. This problem was attacked in different ways. Where the carrier had *contracted* to transport the shipment to a point beyond its own line, the connecting carriers were regarded as the agents of the contracting carrier and liability for the entire route, flowing from the contract, was upheld. But further difficulty lay in determining whether a contract of that kind existed. Some courts would infer the presence of the contract from mere acceptance by the carrier of goods for transportation beyond its line. Others required minimal but positive evidence of a contract. In addition, some states enacted statutes on the subject. See generally as to this, Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 196–200, 31 S.Ct. 164, 55 L.Ed. 167, and Adams Express Co. v. Croninger, supra, at pages 504–505 of 226 U.S., at page 151 of 33 S.Ct.

■ This state of the law led to the adoption in 1906 of the Carmack Amendment. Its purpose has been described:

"The rule is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility. The regulation is one which also facilitates the remedy of one who sustains a loss, by localizing the responsible carrier."

Atlantic Coast Line R. Co. v. Riverside Mills, supra, at page 203 of 219 U.S., at page 169 of 31 S.Ct.

"The congressional action has made an end to this diversity; * * * This was doubtless the purpose of the law; * * *"

Adams Express Co. v. Croninger, supra, at page 505 of 226 U.S., at page 152 of 33 S.Ct.

"The purpose of the Carmack Amendment was to relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."

Reider v. Thompson, 339 U.S. 113, 119, 70 S.Ct. 499, 502, 94 L.Ed. 698. Its effect has also been noted:

"The indisputable effect of the Carmack amendment is to hold the initial carrier engaged in interstate commerce and 'receiving property for transportation from a point in one state to a point in another state' as having contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents." Atlantic Coast Line R. Co. v. Riverside Mills, supra, at page 196 of 219 U.S., at page 166 of 31 S.Ct.

Galveston, H. & S. A. Ry. Co. v. Wallace, 223 U.S. 481, 491, 32 S.Ct. 205, 56 L.Ed. 516. Congress in 1927, 44 Stat. 1448, extended this liability to the delivering carrier so that today both the receiving carrier and the delivering carrier stand in the same position of responsibility to the shipper.

■ The litigants here have no real quarrel with these general rules. We mention them in part for background. But we also mention them because they spell out two legal propositions of particular pertinence here: (a) a carrier by contract may assume responsibility for a shipment over the entire route and (b) under Carmack the receiving or initial carrier is made responsible for the shipment over the entire route. We consider the application of these rules to the facts before us.

A. Contract. As suggested in Atlantic Coast Line R. Co. v. Riverside Mills, supra, at page 196 of 219 U.S., at page 166 of 31 S.Ct., the question, wholy independent of Carmack, is whether the carrier has contracted to carry the goods from origin to destination or, on the other hand, has agreed only to carry the shipment safely over its own line and then to deliver it to the next carrier as the agent of the shipper. As applied here the question is whether the Barge Line agreed for the transportation of the 1955 shipments from Sharpe Station to Memphis General Depot so as to render the Illinois Central, the Port Commission and the Stevedoring Company its agents or whether it agreed only to transport the goods safely over the water segment of the route.

A bill of lading may constitute the contract of shipment. A. Russo & Co. v. United States, 5 Cir., 40 F.2d 39,,42; see Missouri, Kans. & Tex. Ry. Co. v. Ward, 244 U.S. 383, 387, 37 S.Ct. 617, 61 L.Ed. 1213. We regard the 1955 bills employed here as most significant and as constituting effective contracts between the Barge Line as carrier and the Government as shipper. Each is executed on behalf of the Barge Line and the Government and each is in fact the only basic document between the parties concerning the shipments in question. Furthermore, each bill compels the conclusion that by its terms the Barge Line undertook responsibility for the shipment over the entire route. We are impressed as to this by the Barge Line's description therein as the "Initial Transportation" and as the "Transportation Company", by the recital that the Barge Line received the goods, by Sharpe Station's designation as the Shipping Point, by the absence of mention of any connecting carrier, by the Barge Line's advance of the handling and switching charges, by its being billed directly for these, by the characterization of the Illinois Central's function as one of mere "switching" and "handling" services, by the single billing of all charges to the Government, and by the consignee's receipt running to the Barge Line and not to the railroad. It is true that the bill does designate Memphis as both the Destination and as the Point of Delivery, but any significance of this detail is overcome and nullified by the contrary and positive factors we have just noted.

The Barge Line, however, argues that the executed government bill did not constitute the entire contract between the parties; that in fact it incorporated by specific reference the Barge Line's own bill form and the "same rules and conditions as govern commercial shipments" on the Barge Line; that the Barge Line's bill recites that the "shipment has been loaded by the shipper" and the "condition of the shipment" is "unknown"; that the use of the government form was at the Government's insistence and for its accounting convenience and should be construed against the Government; and that therefore the Government; has failed to show that each shipment was in good condition when received by the Barge Line. The Isla de Panay, 267 U.S. 260, 273, 45 S.Ct. 269, 69 L.Ed. 603, and The Florinda, 2 Cir., 31 F.2d 262, 264, certiorari denied Saitta v. Florinda, 279 U.S. 874, 49 S.Ct. 514, 73 L.Ed. 1009, are cited. The Barge Line finally urges that the shipments moved under the B Rates of its Tariff; that those rates did not include switching and handling charges; that the Tariff specifies that in any arrangement made by the Barge Line for handling a shipment to and from barges it acts as the customer's agent only and is not liable for damage to goods while being so handled; and that therefore it effectively restricted its contractual liability to damage occurring on its own line.

We are not convinced by this approach. While the Barge Line could have limited its contractual liability (as distinguished from possible liability it might have as an initial carrier under Carmack) and while the government bill does make reference to the carrier's

"usual forms" and the like, we conclude that the government bill, executed by the Barge Line and exclusive of the Barge Line's form, constituted the contract between the parties and overrode any inconsistent aspects, actual or apparent, of the Barge Line's bill or of the Tariff. The government bill was the only one executed and employed here. We regard it as meeting and satisfying the "Unless otherwise specifically provided" phrase on its reverse side. Its content and the formality of its execution deny anticipated substitution by the Barge Line's form.

The Barge Line's contentions also appear to be completely answered by the case of Alcoa S. S. Co. v. United States, 338 U.S. 421, 70 S.Ct. 190, 94 L.Ed. 225. That, too, was a Tucker Act suit for a freight charge. It involved the use of a government bill of lading with the same "Unless" clause and with its reference to the carrier's "usual forms". The carrier's own bill called for the payment of freight charges upon the carrier's receipt of the goods. The shipment was lost in transit. The Court said, at pages 424–425 of 338 U.S., at page 192 of 70 S.Ct.,

> "With due regard to the principle of strict construction against the draftsman of a contract, we have concluded that the terms of the government bill of lading are inconsistent with petitioner's Clause 6, and that the United States is not liable for freight on this lost public property."

and thus held that the terms of the executed government bill prevailed over the inconsistent provisions of the carrier's bill form or, in other words, that the government bill, within its very terms, "specifically" negatived the carrier's provision.

It is no defense to this conclusion, as claimed by the Barge Line, that it had no power to make a contract covering the entire route here because no through

tariff had been filed, as required,[17] with the Interstate Commerce Commission. This argument was rejected in Norfolk & W. Ry. Co. v. Dixie Tobacco Co., 228 U.S. 593, 595, 33 S.Ct. 609, 57 L.Ed. 980 which, although it involved the Carmack Amendment and a land carrier, encountered a corresponding tariff filing requirement.[18] Compare Baer Bros. Mercantile Co. v. Denver & R. G. R. R., 233 U.S. 479, 490–491, 34 S.Ct. 641, 58 L.Ed. 1055.

B. The Carmack Amendment. For Carmack to be applicable here (a) a "common arrangement" must exist and (b) the Barge Line must be the "receiving" or "initial" carrier within § 1(1) (a) and § 20(11), respectively, of the Interstate Commerce Act, 49 U.S. C.A. §§ 1(1) (a) and 20(11).

Part I of the Act which includes these sections was directed, generally speaking, to rate discrimination and other abuses in railroading. Interstate Commerce Commission v. Baltimore & O. Railroad, 145 U.S. 263, 276, 12 S.Ct. 844, 36 L.Ed. 699; Mutual Transit Co. v. United States, 2 Cir., 178 F. 664, 666. But it clearly applies as well to certain connecting water transportation. Interstate Commerce Comm. v. Goodrich Transit Co., 224 U.S. 194, 207, 32 S.Ct. 436, 56 L.Ed. 729.

It seems to be agreed here that there is no "common control" or "common management" between the Barge Line and the Illinois Central and the first question therefore is the usual narrow one whether a "common arrangement" existed. This term has received no precise and uniform definition either in the statute or in the decided cases. It contemplates, of course, not an arrangement between the shipper and the carrier but one between carriers "giving to one or the other, or both, such an interest in or control over the entire undertaking as to constitute the continuous transportation in some sense of common enterprise"; this approach was

---

17. 49 U.S.C.A. § 906(d).

18. Now 49 U.S.C.A. § 6(7).

then in line with the statutory purpose of preventing abuses by rail carriers. United States v. Munson Steamship Line, 4 Cir., 37 F.2d 681, 683, 684. Such an arrangement has been inferred from the use of a through bill of lading for an interstate shipment with a conventional division of charges. Cincinnati, N. O. & Tex. Pac. Railway Co. v. Interstate Com. Comm., 162 U.S. 184, 192–193, 16 S.Ct. 700, 40 L.Ed. 935; Louisville & Nashville Railroad Co. v. Behlmer, 175 U.S. 648, 662, 20 S.Ct. 209, 44 L.Ed. 309. Yet, according to the former case, it may be "otherwise manifested" as by "concert of action", Chicago, B. & Q. Ry. Co. v. United States, 8 Cir., 157 F. 830, 833, affirmed 209 U.S. 90, 28 S.Ct. 439, 52 L.Ed. 698; Standard Oil Co. of New York v. United States, 2 Cir., 179 F. 614, 621, certiorari denied 218 U.S. 681, 31 S.Ct. 229, 54 L.Ed. 1207, and "does not depend upon the establishment of a through-route or the issue and recognition of a through bill of lading". Baer Bros. Mercantile Co. v. Denver & R. G. R. R., 233 U.S. 479, 491, 34 S.Ct. 641, 646, 58 L.Ed. 1055. See General Accident Fire & Life Assur. Corp. v. Piazza, 4 N.Y.2d 659, 176 N.Y.S.2d 976, 152 N.E.2d 236, 240, and Hudson Handkerchief Mfg. Corp. v. Porto Rican Exp. Co., 274 App.Div. 509, 85 N.Y.S.2d 294, 297.

A more recent case is United States v. Munson S. S. Line, 283 U.S. 43, 51 S.Ct. 360, 75 L.Ed. 830. Here a common arrangement was held not to exist. Munson operated steamers between Baltimore and Florida points. It received goods transported by rail carriers to Baltimore from the interior. No through bills of lading were issued and no joint rates or division of rates were established. Baltimore was the destination designated on the rail bill of lading. The shipper sent the rail bill to Munson and the latter received delivery at Baltimore. The rail bill was then surrendered to the rail carrier. Munson paid the rail charges, unless they had been prepaid, and issued its own bill to the shipper.

The court held, 283 U.S. at page 47, 51 S.Ct. at page 362, that "a mere practical continuity in the transportation is not enough", that under the statute it is permissible for a water carrier to keep its own carriage distinct and independent, and that a common arrangement "is not to be inferred from circumstances which are entirely consistent with" this independence. See also Ex parte Koehler, C.C.D.Or., 30 F. 867, and Mutual Transit Co. v. United States, supra, at page 667 of 178 F.

We are not unmindful here that there was no joint rail-water rate established by the Barge Line's filed Tariff; that the rates named therein "apply f. o. b. barge at origin to f. o. b. barge at destination"; that the joint rates it did specify named only water carriers; that the B rates included "only limited liability" and said that the carrier acted as the customer's agent in making arrangements for the loading, unloading and handling of shipments from barges; that the rail hauls were for only a few miles; that the bills designated Memphis as the destination; that the Illinois Central issued separate invoices; that the February 1955 shipment also involved separate Baton Rouge bills of lading issued by the railroad; that there is no evidence of frequency of shipments between this origin and this destination; that the Barge Line may well be subject to regulation under Part III of the Interstate Commerce Act; and that § 1(2) (c) denies regulation under Part I merely because a water carrier absorbs a rail carrier's switching and handling charges in a port terminal (and thus appears to prevent a similar conclusion based upon advancement of such charges). On the other hand, this case does involve bills of lading specifying Sharpe Station as the shipment origin. There was no billing of charges by the Illinois Central or the Port Commission to the shipper. The invoices and bills went instead to the Barge Line and charges with respect thereto were paid by the Barge Line. The Government's

contact and contract were with the Barge Line and not with the Illinois Central. The facts of independence present in Munson are absent here. We feel the situation approximated more rather than less of the statutory concept of common arrangement and we hold that one existed. Here again the fact that no tariff was on file specifying a joint rail-water route and rate does not prevent this conclusion. Baer Bros. Mercantile Co. v. Denver & R. G. R. R., supra; Norfolk & W. Ry. Co. v. Dixie Tobacco Co., supra.

What we have said above in discussing the contract character of the bills of lading here applies equally to the question whether the Barge Line was the initial or receiving carrier under Carmack. The facts of each are necessarily important and determinative. There is little doubt, however, under the decided cases that customarily the *contracting* carrier is the initial carrier contemplated by the statute. This, after all, is the carrier with which the shipper does business and to which it looks. " * * * (T)he connecting lines become in effect mere agents, whose duty it is to forward the goods under the terms of the contract made by their principal, the initial carrier." Missouri Kans. & Tex. Ry. Co. v. Ward, supra, at page 388 of 244 U.S., at page 619 of 37 S.Ct. " * * * (B)y 'initial carrier' is meant the one who first contracts to transport the shipment from one state into another, and not the one who first merely receives or handles it in some incidental or subsidiary way * * *." Houston, E. & W. T. Ry. Co. v. Houston Packing Co., Tex.Civ.App., 221 S.W. 316, 317. Often, and perhaps usually, the contracting carrier is the same one which physically receives the goods from the shipper; conversely, in the absence of other evidence, the first receiver is taken to be the initial carrier because it is regarded as the contracting carrier. Golden Grain Milling Co. v. St. Louis, S. & P. R., 226 Ill.App. 116; Watterson v. New York Central Railroad Company, 6

Cir., 235 F.2d 114, 115. This is so in many cases even though that carrier performs little more than switching services. See Barrett v. Northern Pac. Ry. Co., 29 Idaho 139, 157 P. 1016, 1018; W. H. Aton Piano Co. v. Chicago, M. & St. P. Ry. Co., 152 Wis. 156, 139 N.W. 743, 745. But such a switching operation by one carrier does not prevent the contracting carrier from being the initial carrier under Carmack. Houston, E. & W. T. Ry. Co. v. Houston Packing Co., supra; Utz v. Chicago, B. & Q. Ry. Co., Mo.App., 208 S.W. 640; see Knapp v. Minneapolis, St. P. & S. S. M. Ry. Co., 33 N.D. 291, 156 N.W. 1019, 1024; Davis v. St. Louis Southwestern Ry. Co., D.C. W.D.La., 106 F.Supp. 547, 551, affirmed 5 Cir., 204 F.2d 251; Savannah, F. & W. Ry. Co. v. Commercial Guano Co., 103 Ga. 590, 30 S.E. 555, 557.

The trial court, in holding that the initial carrier under Carmack is the carrier first receiving the goods and that here the Illinois Central was the initial carrier, cited Watterson v. New York Central Railroad Company, supra, and Beard v. St. Louis, A. & T. H. Ry. Co., 79 Iowa 527, 44 N.W. 803, as supporting authority. The Watterson case, however, emphasizes the absence of evidence there "as to which carrier issued the bill of lading", [235 F.2d 115] that is, the absence of evidence as to which carrier was the contracting carrier and went on, in line with cases cited above, to treat the carrier which first received the goods as the contracting and therefore initial carrier. The Beard case directly placed its initial carrier determination upon the existence of a contract. We feel that the facts here are essentially the same as those in the Houston and Utz cases, and we conclude that the Baton Rouge services of the Illinois Central amounted to no more than the receipt and handling of the shipments concerned in an "incidental or subsidiary way" and that the Barge Line was clearly the contracting and the receiving carrier. Its liability for the damages to the Government's shipments follows accordingly.

**394**

This conclusion makes it unnecessary for us to consider additionally whether the Barge Line also qualified as the delivering carrier under Carmack.

The judgment below is vacated in its entirety and the case is remanded for further proceedings in accordance with this opinion