LUMBERMENS MUTUAL CASUALTY COMPANY et al., Respondents, *v.* TRAVELERS INSURANCE COMPANY et al., Appellants, et al., Defendants.

Fourth Department, May 30, 1974.

*Adams, Brown, Starrett & Maloney, P. C. (Arthur J. Maloney* of counsel), for appellants.

*Brownstein, Canale, Madden, Burke & Siegel (John F. Canale* of counsel), for respondents.

MARSH, P. J. This is an appeal by Travelers Insurance Company and Coder Service, Inc. from a judgment in a declaratory judgment action which determined that Travelers Insurance Company provided primary comprehensive automobile liability coverage for Coder Service, Inc., Motor Rail Transport, Inc., George Sanders (driver) and Great Northern Railroad Company, Inc. with respect to a certain motor vehicle accident. It also determined that Coder Service, Inc. and Great Northern Railroad Company, Inc. were not covered by Lumbermens Mutual Casualty Company's comprehensive automobile liability policy, and provided further that Lumbermens Mutual Casualty Company provided excess coverage to Motor Rail Transport, Inc. and George Sanders.

Motor Rail Transport, Inc. was advised by telegraph that a shipper, S. S. Kresge of Ft. Wayne, Indiana, was going to ship 1,331 cartons via the Norfolk and Western Railroad. Motor Rail is in the business of a common motor carrier. The goods were shipped by piggy-back trailer. The shipment in question arrived on February 3, 1970. Norfolk and Western notified Motor Rail by phone, and a tractor was sent from Motor Rail to the Norfolk and Western yard. The trailer was attached to the Motor Rail tractor and it was hauled to Motor Rail's terminal on Exchange Street in the City of Buffalo. The trailer was completely unloaded at Motor Rail's Exchange Street terminal. On February 4 the same trailer drawn from the Norfolk and Western yard was reloaded with some of the S. S. Kresge car-

tons destined for the Kresge store at the L. B. Smith Plaza on Abbott Road.

George Sanders, a driver for Motor Rail, took the Kresge load for L. B. Smith Plaza and delivered it that day. After unloading, Sanders called Motor Rail terminal and asked what he should do with the piggy-back trailer from Norfolk and Western, and he was instructed to return the trailer to the Norfolk and Western yards on Harlem Road. While en route to the railroad yards Sanders was involved in a motor vehicle accident on North Ogden and Reiman Streets in the City of Buffalo. The Norfolk and Western yard is located in the Village of Sloan, Town of Cheektowaga, Motor Rail terminal is located in the City of Buffalo and the L. B. Smith Plaza and Kresge store are located in the City of Lackawanna.

On February 15, 1970 Jeanette Gehrke, as administratrix of the estate of Robert J. Gehrke, deceased, instituted an action against Motor Rail Transport, Inc., George Sanders, Coder Service, Inc. and Great Northern Railroad Company, Inc. seeking recovery for damages resulting from the death of the intestate, Robert J. Gehrke, due to the accident of February 4, 1970. In the instant declaratory judgment action a determination is sought as to the respective insurance coverage of Lumbermens Mutual Casualty Company and Travelers Insurance Company. The parties stipulated that the tractor driven by George Sanders, an employee of Motor Rail, was owned by Coder Service, Inc. and was under lease between Coder and Motor Rail, providing for 60-day option terms with 60-day renewals. It was also stipulated that the tractor is a hired vehicle within the meaning of both the Lumbermens and the Travelers comprehensive liability coverage. It was further stipulated that George Sanders, an employee of Motor Rail, operated the tractor and trailer unit on February 4 and was in the course of his employment when the accident occurred and that Great Northern Railroad Company, Inc. owned the trailer. Lumbermens Mutual Casualty Company insured Motor Rail and Travelers Insurance Company insured Coder.

The Lumbermens Mutual Casualty Insurance Company policy provides under "Coverage" Part I:

"Each of the following is an insured under the insurance to the extent set forth below:

"II (a) The Named Insured. * * *

"(c) Any other person while using an owned automobile or a hired automobile with permission of the Named Insured, pro-

vided the actual operation  *  *  *  is within the scope of such permission  *  *  *.

"(d) Any other person or organization, but only with respect to his, or its liability because of acts or omissions of an insured under (a), (b) or (c) above."

"None of the Following Is An Insured:

"(ii) The owner  *  *  *  of a hired automobile  *  *  *."

Under V a hired automobile is defined:

"Hired automobile means an automobile not owned by the named insured which is used under contract in behalf of, or loaned to, the named insured".

Under VI it is provided:

"Excess insurance — hired and non-owned automobiles.

"With respect to a hired automobile or a non-owned automobile, this insurance shall be excess insurance over any other valid and collectible insurance available to the insured."

Special Indorsement A 3806, entitled Truckmen-Hired Automobiles, modifies by its terms the provisions of the policy relating to comprehensive automobile liability insurance of which the sections quoted above form a part. Indorsement A 3806 provides:

"It is agreed that the insurance applies with respect to hired automobiles, subject to the following additional provisions:
*  *  *

"(d) The insurance does not cover as an insured, the owner *  *  * of a hired automobile  *  *  * if the bodily injury or property damage occurs:

"(1) While the automobile is not being used exclusively in the business of the Named Insured and over a route the Named Insured is authorized to serve by Federal or Public Authority; but this limitation shall not apply to an automobile while enroute, at the request of the Named Insured, to engage in such exclusive use and not transporting property of others; or

"(2) After the arrival of the automobile at its destination under a single-trip contract which does not provide in writing for the return trip of the automobile;

"(e) When used in reference to the insurance under this indorsement, the definition of 'hired automobile' is amended to read:

"'Hired automobile' means an automobile not owned by the named insured which is used under contract in behalf of, or loaned to, the named insured.

"(f) With respect to any automobile of the commercial type while leased or loaned to any person or organization, other than

the named insured, engaged in the business of transporting property by automobile for others, or any private passenger automobile, the insurance under this indorsement shall be excess insurance over any other valid and collectible insurance available to the insured. Otherwise, the insurance under this indorsement is primary insurance.''

It is clear under the above provisions that Motor Rail is covered as the named insured under Coverage Part I, II (a) and that George Sanders is covered under II (c) as a person using a hired automobile with the permission of the named insured and within the scope of the permission. However, under Coverage Part I, Coder is not covered as an insured since it is an owner of a hired automobile (II [ii]). Great Northern as the owner of the trailer would not be covered under Coverage Part I since it is an organization whose liability would ensue from the use of a trailer with a motor vehicle owned by the person or organization not covered by the policy (II [ii] [2]). Lumbermens' indorsement A 3806 (d) would only include Coder under its coverage as the owner of a hired automobile if the tractor was being used exclusively in the business of the insured and over a route authorized to be served '' by Federal or Public Authority ''.

There is no question but that the motor vehicle was being used in the exclusive business of the named insured. However, the Federal authority in question would be the Interstate Commerce Act Part II. An exclusion from the operation of the Interstate Commerce Act Part II dealing with the motor carrier is contained in section 303 (subd. [b], par. [8]) of title 49 of the United States Code: '' the transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone, and provided that the motor carrier engaged in such transportation of passengers over regular or irregular route or routes in interstate commerce is also lawfully engaged in the intrastate transportation of passengers over the entire length of such interstate route or routes in accordance with the laws of each State having jurisdiction ''.

Also, section 63-i (subd. 3, par. [c]) of the Public Service Law, now covered by section 160 (subd. 3, par. [c]) of the Transpor-

tation Law, exempts motor carriers from its regulation while transporting within certain zones: " the transportation of property wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment by motor vehicle to or from a point without such municipality or municipalities or zone, and except the transportation of household goods between points within cities of a population of one million persons or more and between points within such cities and municipalities contiguous thereto or within a zone adjacent to and commercially a part of any such cities ".

The question presented with respect to the application of the Interstate Commerce Act Part II and the Public Service Law concerns whether Motor Rail was traveling over an authorized route " by Federal or Public Authority ", the public authority being the New York State Public Service Commission and the Public Service Law of the State of New York. The rules of the Public Service Commission with respect to commercial zones for the motor carriers of property provide in section 850.1 (16 NYCRR 850.1) that the commercial zone of the City of Buffalo includes the City of Lackawanna and the Town of Cheektowaga, including all the villages lying within such towns. The transportation from the railroad in the Village of Sloan to Motor Rail's terminal in the City of Buffalo, then to the Kresge store in the L. B. Smith Plaza in the City of Lackawanna, and then to the Town of Cheektowaga all transpired in the commercial zone of the City of Buffalo, hence the Public Service Law and the Interstate Commerce Act, Part II, did not regulate the instant trip unless the transportation " is under a common control, management, or arrangement for a continuous carriage ", that is, under a common control, management or arrangement from Ft. Wayne, Indiana to the L. B. Smith Plaza.

*General Acc. Fire & Life Assur. Corp.* v. *Piazza* (4 N Y 2d 659) is in point on the question of whether this shipment was regulated pursuant to Federal interstate commerce authority. In *Piazza,* two common carriers, Stone's Express, Inc. and Ben Franklin Lines, Inc., engaged in transporting goods for hire by motor carriers and each had certificates of public convenience and necessity from the Interstate Commerce Commission. Franklin leased a truck from Stone's pursuant to a written lease and Franklin was employed to carry certain copper coils from a plant located in Yonkers, New York, for delivery to a

pier in Brooklyn, New York. The wire was then to be loaded upon a ship of the American Hawaiian Steamship Company for transportation to the west coast. While the wire was being loaded upon the Franklin vehicle in Yonkers, New York, a copper coil fell and struck one Piazza who commenced an action against Franklin, its driver and the owner of the truck (Stone's). Franklin was covered by its own liability insurance. Franklin's policy provided that it was excess insurance over any valid and collectible insurance with respect to hired vehicles. The carrier for Stone's had an omnibus indorsement which excluded as an insured any person or organization required to carry liability insurance under a motor carrier law. In *Piazza*, the Court of Appeals held that the shipment from Yonkers to the Brooklyn pier was in the commercial zone of New York City and exempt from Federal and State carrier regulations, thus requiring the owner's policy to cover the lessee Franklin and its driver. The opinion reasoned that the shipment was not under the common control or management of one single carrier, that is, where one carrier makes the arrangements for the shipment, bills the shipper for the entire shipment and pays any connecting or switching carriers (*United States* v. *Munson S.S. Line*, 283 U. S. 43; *United States* v. *Mississippi Val. Barge Line Co.*, 285 F. 2d 381). The opinion in *Piazza* (4 N Y 2d 659, 668–669, *supra*) discussed whether a common arrangement for a "continuous carriage or shipment" existed thus bringing it under Federal and State regulation: "The court went on to hold that, since the carrier there [*United States* v. *Munson S.S. Line, supra*] had a contract and rate independent of those of the participating carrier and it received its instructions separately and directly from the shipper, the transportation was not under a common arrangement. The fact that the transportation by the carrier constituted one stage of an interstate shipment did not suffice to bring it within the statute's language. * * *

"A 'common arrangement', as defined in the cases, amounts to an agreement or understanding between the connecting carriers with respect to the transportation and charges. It may be evidenced by the fact that the goods or freight were carried under a through bill of lading stating a division of charges [citation of cases]. It has also been found where the initial carrier gave the shipper a through receipt and made all arrangements with the connecting carrier independently of the shipper * * *. Nothing indicates its presence in the case before us. The record establishes that Franklin's part in the shipment

was wholly within New York and Yonkers. This places it within the exception created by section 303."

In the instant case, E. W. Blynt, the eastern terminal manager for Motor Rail testified that Motor Rail was in the business of a common carrier and that it picked up railroad trailers or unloaded them right off the railroad trailer, using tractors leased from Coder. The shipper S. S. Kresge advised Motor Rail by telegraph at its Syracuse office that a trailer of goods was being shipped by Kresge via Great Northern through Norfolk and Western from Ft. Wayne, Indiana. No arrangement was made with the railroad for the shipment. The consignor was S. S. Kresge and all charges were separately billed by Motor Rail to S. S. Kresge Company and paid by S. S. Kresge Company. Such charges were separately arranged and negotiated directly between Motor Rail and S. S. Kresge. As was the case in *Piazza* the instant shipment was not under a through bill of lading, nor was there any agreement between Motor Rail and Great Northern as to rates or transportation. Motor Rail's only connection with the railroad carrier was to pick up the piggy-back at the railroad, unload it, deliver the goods and return the trailer to the railroad yards. Motor Rail did not bill the railroad, nor were there any common transportation charges split between the two.

The carriage by Motor Rail from the Sloan yards at Norfolk and Western in the Town of Cheektowaga to its terminal, thence to the L. B. Smith Plaza and Kresge store and back to the railroad yard was entirely within the " commercial zone " of the City of Buffalo and exempt from Interstate Commerce Commission and Public Service Commission regulations unless the element of " common control, management, or arrangement ". was present. It can be seen from the facts and the reasoning in the *Piazza* case, *United States* v. *Munson S.S. Line* (*supra*), and *United States* v. *Mississippi Val. Barge Line Co.* (*supra*) that such element was not present and that the trip in question was not " over a route * * * authorized * * * by Federal or Public Authority " within the meaning of Indorsement A 3806 (d) (1). It follows that Coder and Great Northern are not insureds under the Lumbermens policy, for the status of the owner of the trailer is the same as the status of the owner of the motor vehicle with respect to Part I Coverage (Coverage Part I, II (iv) (2)).

The comprehensive automobile liability insurance coverage Part I in the Travelers policy is the same as in the Lumbermens policy. However, Indorsement 8000 (D) provides:

" This indorsement modifies the provisions of the policy relating to the following: Comprehensive automobile liability:
\* \* \*

" Such insurance as is afforded by \* \* \* the comprehensive with respect to any automobile does not apply to any person or organization or any agent or employee thereof other than the named insured engaged in the business of transporting property by automobile for others and subject to the requirements of a State or Federal authority regulating motor carriers of passengers or property."

It is clear, from the analysis of the application of " State or Federal authority regulating motor carriers " discussed above with respect to the Lumbermens policy, that Indorsement 8000 (D) does not apply so as to exclude Motor Rail and Sanders as insureds, and Motor Rail and Sanders are specifically covered under the Travelers policy, II Persons insured (c) (1) (2).

Indorsement 8000 (D) of the Travelers policy provides, among other things: " *Other Insurance.* This insurance shall be considered as excess insurance where other insurance exists in the name or for the benefit of the insured and this insurance shall not apply nor contribute to the payment of any loss until all other insurance shall have been exhausted."

In accordance with the Lumbermens Indorsement A 3806 (f), Lumbermens policy provides primary coverage for Motor Rail and its driver, George Sanders. It provides no coverage for Coder or Great Northern. The Travelers policy provides primary coverage for Coder and Great Northern and excess coverage for Motor Rail and George Sanders. Judgment should be entered accordingly.

MOULE, CARDAMONE, SIMONS and DEL VECCHIO, JJ., concur.

Judgment unanimously modified in accordance with opinion and as modified affirmed, with costs to appellants.